# COBB v. ST. LOUIS AND HANNIBAL RAILWAY COMPANY, Appellant.

| | |
|---|---|
| 149 | 609 |
| 94a | ²228 |
| 149 | 609 |
| 175 | ¹670 |
| 96a | 630 |
| 97a | 381 |
| 100a | 193 |
| 100a | 615 |

## Division Two, May 23, 1899.*

1. **Railroads:** BRIDGES: WASHOUTS: INSPECTION. In an action against a railroad for injury received in a wreck resulting from the bent of a bridge being washed out, the testimony showed that the stream was turbulent and dangerous, subject to sudden floods, which frequently destroyed portions of the bridge, which was an unsafe one for that locality, and, instead of being built on stone abutments let down to bedrock, or on sills bolted to the solid rock, was built on posts, and when any of these washed out, bents were rested on ties or blocks placed on the surface. The company knew that a great rise had occurred in the stream the night before, but did not know of a heavy rain later in the night. *Held,* that it was negligent in running its train over the bridge the next morning without inspecting it.

2. **Personal Injury:** RECOVERY: PHYSICIAN'S SERVICES. Where plaintiff's testimony that he did not keep an account, but his expense for medical attention, etc., "as near as he could get at it," was a certain sum, was not objected to as too general, and he was not cross-examined thereon, it was sufficient to support an instruction covering such expense.

3. ———: ———: ———: NO EVIDENCE. Charges opposed to the evidence, or covered by charges given, are properly refused.

4. **Building Bridges:** EXPERT'S OPINION: BASED ON OTHER'S EVIDENCE. An expert on bridge building, though not acquainted with the *locus in quo,* may give his opinion as to whether a bridge was properly built in that locality from hearing other witnesses, who are acquainted, testify as to the character of the bridge.

*NOTE.—Decided March 28, 1899. Motion for rehearing stricken from files May 23.

VOL. 149 mo—39

5. **Personal Injuries:** EXCESSIVE DAMAGES. Eleven thousand four hundred dollars is not an excessive recovery for a strong, healthy man of 27, an express messenger, who receives injuries making him a mental and physical wreck, with no chance of ultimate recovery, and with his usefulness in making a living ruined, the injuries consisting of a compound fracture of the skull, affecting the brain and the nerve of one eye, probably necessitating its removal.

*Appeal from Hannibal Court of Common Pleas.*—HON. REUBEN F. ROY, Judge.

AFFIRMED.

HOSTETTER & JONES for appellant.

(1)   The demurrer to the evidence should have been sustained.   All the evidence shows the bridge to have been properly constructed and sufficient to withstand the effects of all ordinary storms and floods.   Which evidence is rendered conclusive by the fact, which is uncontroverted and undisputed, that the bridge stood safe and secure against the effects of all storms and floods which occurred in the four years and a half intervening between the date of its completion in December, 1891, and the date of the trial in May, 1896, save and except on the night preceding the accident.   Defendant is not liable for an injury resulting from an extraordinary and unprecedented storm. Ellet v. Railroad, 76 Mo. 518; Flori v. St. Louis, 69 Mo. 341; Gillispie v. Railroad, 6 Mo. App. 554; Railroad v. Halloren, 53 Tex. 47.   The interposition of the demurrer at the close of the case requires this court to review the evidence taken as a whole.   Hite v. Railroad, 130 Mo. 132; Hilz v. Railroad, 101 Mo. 36.   Carriers of passengers are not responsible for accidents where all reasonable care, skill and diligence have been employed.   Sawyer v. Railroad, 37 Mo. 241; 5 Am. & Eng. Ency. of Law (2 Ed.), 531; Henry v. Railroad, 113 Mo. 525.   The evidence in this case is of such a character as to clearly negative any imputation of

negligence and the trial court should have directed a verdict for the defendant. Jackson v. Hardin, 83 Mo. 186; Howell v. Railroad, 76 Mo. 80; Reichenbach v. Ellerbe, 115 Mo. 588. (2) Where an injury is attributable to the act of God defendant can not be held liable unless it appears that its negligence directly contributed thereto. Davis v. Railroad, 89 Mo. 340; American.Brew. Assn. v. Talbott, 141 Mo. 681; Sullivan v. Railroad, 133 Mo. 1. (3) Plaintiff's instruction numbered 2 on the measure of damages was erroneous in this particular: The plaintiff himself gave the only testimony that was given in evidence on the trial upon this point. He said in substance that he had expended about $400 for nurse and doctors and expenses attached to doctors—ice, medicines, etc. It is well settled by the authorities that plaintiff can not recover for medical services rendered him in the absence of evidence as to the value of such service. Smith v. Railroad, 108 Mo. 243; Rhodes v. Nevada, 47 Mo. App 499; Madden v. Railroad, 50 Mo. App. 666; Duke v. Railroad, 99 Mo. 351; Hunter v. Mexico, 49 Mo. App. 17; Nixon v. Railroad, 141 Mo. 440. This rule has been held not to apply to services rendered by nurses because jurors are presumed to be familiar with the value of such services. Murray v. Railroad, 101 Mo. 236.

F. L. Schofield and Geo. A. Mahan for respondent.

(1) The evidence clearly shows an unsafe bridge; a bridge not reasonably sufficient to withstand the violent floods to which the stream was at all times subject. It also tends strongly to prove the want of ordinary care on the part of defendant's servants in discovering the disordered condition of the bridge following the rains before the train was drawn upon it. Even were it the province of this court to weigh the testimony and determine the question of its preponderance, it is not believed that the verdict would be disturbed. But it is not. Nor is it any more the duty of the trial court. Gutridge v. Railroad, 105 Mo. 525; Clothworthy v. Railroad, 80

Mo. 220; Twohey v. Fruin, 96 Mo. 104; Smith v. Hutchinson, 83 Mo. 683; Voegeli v. Granite Co., 56 Mo. App. 678. And this rule is especially applicable to cases involving the reasonable sufficiency and safety of instrumentalities for labor or public travel, and the discovery of dangerous defects therein. Gutridge v. Railroad, 105 Mo. 525; Culverson v. Maryville, 67 Mo. App. 343; Bender v. Railroad, 137 Mo. 240. (2) The doctrine of exemption from liability for the act of God is not applicable here. The testimony does not show that the flood which swept away the bent of the bridge was either unprecedented or extraordinary for that stream. But whether it was extraordinary or not, and if extraordinary, whether reasonable care was exercised to discover and avoid its effects, were likewise questions of fact for the jury. Doster v. Brown, 25 Ga. 24; Ellet v. Railroad, 76 Mo. 518. (3) Where all the details of the construction of a bridge and of its inspection were before the jury, so that the case does not stand alone on the mere fact that the bridge fell, it is the duty of the court to send the case to the jury on the question of reasonable and ordinary care in the construction of the bridge and in keeping it in repair, even where the testimony shows that it was inspected three or four times daily, and three times on the day it fell. Bowen v. Railroad, 95 Mo. 268. (4) There was no error in plaintiff's instruction numbered 2 as to the measure of damage. The evidence showed expenses incurred and expended in surgeon's bills, nursing, medicines, etc., to the amount of $400. In such case proof of the value of such services, medicines, etc., was not requisite. Duke v. Railroad, 99 Mo. 347; Murray v. Railroad, 101 Mo. 240; Smith v. Railroad, 108 Mo. 251; Nixon v. Railroad, 141 Mo. 440; Rhodes v. Nevada, 47 Mo. App. 499; Hunter v. Mexico, 49 Mo. App. 17.

SHERWOOD, J.—Action for $25,000 damages, recovery for $11,400. Plaintiff was acting as expressman of the

Pacific Express Company, and the injury occurred on a car attached to defendant's train, which car fell through a bridge on defendant's road.  Plaintiff received no wages from defendant company, but was employed as an expressman by the express company, as before stated; and by that company he was paid and to it he was responsible, although it was his duty to take care of the baggage in the baggage car in which the express matter was also kept; and to act as baggage master in handling such baggage without charge therefor, by his employer, the express company.

After making the usual prefatory allegations, the petition, in charging the injury producing negligence, states: "That while plaintiff was on such car, in the exercise of due care, in charge of such express matter as aforesaid, and being conveyed by defendant over its said line, he was at a point on a railroad bridge over Big Peno creek in Pike county, Missouri, by reason of the car in which he was riding falling through said bridge on account of the defects in, and insufficiency of said bridge, wounded and injured in the head, face, and eyes. That the said bridge where he was injured was negligently and carelessly and defectively made and maintained, and was at said time in an unsafe and dangerous condition, which said condition was known to the defendant or could have been so known by the exercise of ordinary care, and that his injuries as above set out were caused by the negligence and carelessness of defendant, its agents and servants, in constructing and maintaining such defective, insufficient, unsafe, and dangerous bridge, and in running its said train upon same when in said unsafe and dangerous condition, whereby said bridge gave way and said car in which plaintiff was being conveyed as the same passed over said bridge was caused to fall through the same to the bottom of said creek, thereby injuring plaintiff as aforesaid."

The answer pleads, in substance, a general denial, and then avers that plaintiff was defendant's servant, and under its

control in handling the express matter and baggage, and plaintiff was a fellow servant of all defendant's employees whose duty it was to maintain the bridges along defendant's line of railroad in a safe and proper condition; that defendant's approaches and bridge over Big Peno creek were constructed in a safe, and workmanlike manner, and were always kept in a safe, proper, and perfect condition down to the time of the accident, and that on the night of that occurrence, to wit, May 9, 1894, "a heavy, sudden, unprecedented and unexpected fall of rain took place in the immediate vicinity of said bridge, causing Peno creek to become flooded and swollen at said point to an extraordinary, unusual, dangerous, unforeseen and unexpected degree and extent, whereby one of the bents constituting a portion of the southeastern approach to said bridge was dislodged and washed out by the flood, between said hour of midnight and two or three o'clock on the morning of May 10, 1894, leaving the rails and stringers underlying same intact, and undisturbed; that its nearest station to said bridge is located at Frankford, Mo., and it is about two and one-half miles distant and that no rain of any consequence fell at Frankford during said night, and that the train on which plaintiff was at the time of the accident was a south bound train and left Hannibal on schedule time and passed through Frankford about on time and thereafter reached the said bridge about 7 o'clock on the morning of May 10, 1894, and passed on to said bridge and on to the rails covering the space where said bent in the approach to the bridge had been washed away, precipitating the car in which plaintiff was riding into said washed out space.

"Defendant says that it was impossible for it or any of its agents, servants or employees either in charge of said train or those to whom was intrusted the duty of keeping and maintaining such bridge and its approach in a safe condition to have foreseen the heavy and unusual rainfall and the flood incident to same which occurred the night previous to such

accident and that it was impossible for defendant, its servants· and employees to have provided full and sufficient safeguards against the effect of said rainfall and the violent flood caused thereby, and that it was impossible for defendant, its servants, and employees to have or acquire any knowledge of said heavy rainfall and flood prior to such accident or to have prevented same by the exercise of the utmost prudence, diligence and care on the part of defendant, its servants and employees.

"Defendant therefore says that said accident was an inevitable one, and was caused by the act of God, and the same together with its results were such occurrences which were beyond the power of human ingenuity and ability to either foresee or prevent and defendant is not liable for said accident or any consequences or results following same nor for any damage which plaintiff may have sustained in consequence of same, and now having fully answered, defendant asks to be discharged with its costs."

Reply, a general denial. On this state of the pleadings the parties went to trial.

The evidence in substance showed this state of facts:

A bridge had been built across Big Peno creek in 1872. It had been swept out a number of times, so far as the "bents" were concerned. There had been a very high rise in Peno in 1875, and prior to that as well as subsequent thereto. It was characterized by the witnesses as a "bad stream;" a "very dangerous stream."

The bridge in question had been rebuilt in December, 1891, after numerous washouts had occurred, and thus given frequent warnings of the necessity for a more substantial bridge, and at the time of the accident had stood some two years and four months without a washout or any of the "bents" which supported the bridge, being swept away.

The superstructure was 249 feet in length from the stone abutment on one shore to the other shore, and consists of,

first, a Howe truss eighty-six feet long standing upon stone piers, and second, a wooden structure standing upon a series of "bents" reaching from the Howe truss to the south shore abutment, a distance of 163 feet. The main channel of the stream flows under the Howe truss nearer the north shore, but at high water covers the entire bed beneath the bridge from shore to shore. The "bents" which support the south 163 feet of the bridge are put in at intervals of about sixteen feet apart, being ten in all, and rest upon "mud-sills" sunk into the sand and gravel to an original depth of two or three feet. The bridge stands about twelve or fourteen feet above the creek bottom at the south end of the bridge, the depth gradually increasing toward the center of the main channel.

Notwithstanding the creek when in a turbulent mood had frequently swept out the "bents," the stone piers which were built upon the solid rock, which was some six to ten feet below the gravelly surface of the creek bottom, although some of them stood in the main channel of the creek and had been subjected to many previous storms and consequent floods had never yet yielded to their force, but with undiminished strength had withstood the last storm, which resulted in the litigated injury. Several witnesses stated that stone piers built on the solid rock was the only safe foundation on which to build the bridge at the point indicated, though one of the witnesses admitted that he thought a bridge in the locality designated by the pleadings would be safe provided it were built upon "bents," which rested on iron-shod piles, which were driven through the gravel, etc., into the solid rock, a depth of from six to twelve inches. None of the witnesses testified that the bridge where it was built merely on "bents" as the one in the present instance was, was safe. It is said, however, by defendant's counsel, and repeated, that "others of plaintiff's own witnesses, notably H. F. Tepper, who knew the creek and had worked at that identical bridge crossing, testified that the bent bridge was the safest one that could

Cobb v. St. L. & Han. R'y Co.

be built at that point." This statement has no support whatever in the record, as a careful reading of that shows.

There is another statement made by defendant's counsel requiring correction; it is in regard to what Bishop testified to. Bishop was being cross-examined as to the condition of the bent work, and thereupon the following colloquy ensued:

"Q. Did you examine the foundation of them—of the bent work? A. Yes, sir.

"Q. How deep did you go? A. Well, there was one washed away until they got down to the mud-sill and we found the mud-sills and the sills reasonably sound because they were under water, that is, they were kept damp, and timber won't rot under water."

Defendant's version makes the witness, Bishop, say: "I examined the mud-sills and found them reasonably safe."

John Ford, seventy-six years of age, and who owned a farm and who lived in about a mile or two of the bridge for forty years, asked to give in his own language the character of the Big Peno, said: "Well, I will just have to give it just as I did to Barrett when he first came here with the road. I told him that when it got its Sunday's on, he would see that it would tear the whole bridge out and so it did, when it got its Sunday's on, it did tear it out. It is liable to do that any time." That it was a stream subject to overflow. "When it gets up it is mighty rapid, mighty rapid." "I think the creek is from eight to nine mile long."

Tepper, a carpenter, who had helped rebuild the bridge in 1891, and who had lived in the neighborhood of Peno creek for twenty-nine years, testifying said: "I have noticed that stream, and whenever there is a pretty good rain, a rain like that we had that night, it always does some mischief, always washed out something." He further stated that the stream was habitually subject to overflow, but that it took a hard rain to produce that condition, and then the stream is very swift, and that had been its character ever since he had

been acquainted with it, and that the stone abutment, with the Howe truss on them, were the safest, and had not been affected by the storm on the ninth and tenth of May, 1894.

B. E. Ford, a farmer, lived about one-half a mile from the bridge, and had lived there about thirty-five years before the road was built; he owned a farm on both sides of the creek, and stated that it gave him a good deal of trouble sometimes; that after very heavy rains there was generally a washout. Asked if that had always been the character of that stream, he replied, not so much as in later years; along forty years ago, it was not so bad as it is now. That the stream on the ninth of May, was tolerably high, past fording, and that it rained again about midnight. He went out early on the morning of the tenth of May, about five o'clock, to look after some stock that had got water-bound on the island the evening before, and could not get across. This witness saw that the bent on the south or St. Louis end of the bridge was out before he got within 200 yards of it, and that his fence, which was not washed out the evening before, was washed out during the night, and that there was no water where the bent had washed out, only a little hole of water; that the creek there in its channel was a little full fording for a horse, and that the bent washed out was about 300 yards below, near witness' field and opposite the old tank, and that it was the custom of defendant company after a heavy rain, to examine the locality and send section hands out there to stop the train either at the old tank, or at the bridge, and walk up and examine the bridge; that when the creek has been up, the section hands can see very plainly before they get there, the condition of affairs, and that the wreck occurred about 7:30 in the morning.

James M. Ford, who lived close beside his father, B. E. Ford, also testified to the hard rains during the night, and that his fences not washed away the evening before, had washed away during the night; and the fact that his fences had been washed away could be seen from the railroad between

the bridge and the tank, a distance of about 1,000 feet. Other witnesses testified to there being hard rains about and after midnight on the ninth of May, and among them were some of defendant's witnesses. And one or more of plaintiff's witnesses testified that the heaviest rainfall the night before was between 12 and 2.

Williams, an experienced railroad bridge builder, seventy-two and one-half years old, after relating the great length of his experience in that capacity, in speaking about the present bridge and former bridges, stated: "When it was first built, there were posts put in the ground; holes dug down to the rock and posts put in these holes and then the holes filled up and braced with heavy braces. They stood there and I think that some of them are there yet. They were there at the time I was on the road, some of them, not all. Some washed out. The gravel washed out and the bent went out; then there were other bents put up in other places and put onto ties—the sills of the bents were put on the ties or blocks or whatever could be got at the time; always put up in a hurry to get the train over, and they were put upon these blocks on top of the sand or gravel, not on the rock. Well, of course they would not stay there very long and did not. They washed out again. There are streams that come together just a little above the bridge and where they come together, they come in such a shape that it throws the water off against the bent, away from the bridge, and it flowed around and washed out along there quite a large place on the rock pier that is below it, on the north end of the bridge. Well, there is a short span there put in, a beam bridge. The other end of that bridge stood on piles. Well, as the water washed around here, around in that open place, it threw the water right over on these bents and of course they could not stand a great while on that account. They would never put up a permanent pier there. They would put up just a temporary bent and let it stand just as long as it would stand and when it washed out

they put in another. That has been the principle of that road ever since I have known them."

Locking, shown to be an expert witness, after having heard other witnesses testify as to the character of the bridge across Peno, and the nature of the surroundings and locality, testified that there were only two safe ways to build the bridge over Peno; first, to dig down to the solid rock and build stone abutments upon the rock and then put in a long span from one abutment to the other to carry off all the water, etc.; this would be the preferable plan; the other was to excavate down to the bed rock, drill holes in that, then bore a hole through the sills, insert large iron bolts into the sills and down into the rock, securely fasten the bolts in the rock and then fasten the upper part of the bolts where they came through on the upper side of the sill, etc., that is anchoring the bent to the bed rock.

Of the character of defendant's bridge over Peno, there was an entire unanimity of opinion among those experienced in such matters, that it was not a safe bridge for that locality.

Defendant was not able, indeed, did not attempt to produce a witness to the contrary.

Buckwald, roadmaster of defendant, after testifying as to the way in which the bridge was constructed, testified: "Between 4 and 6 o'clock in the afternoon of May 9th, we had a very heavy rain accompanied by hail, a severe storm, in fact as severe a storm as I had ever seen in that part of the country. I was at the office in Frankford and had ordered an engine to go south and do some work. That came to Frankford about between the hours of six and seven and I got onto that engine and went with them to inspect these bridges. When we got to Peno we found it up very high. We stopped and looked at it and saw the bridge all in good shape and we proceeded to the next high bridge just this side of McCune, and we ran slowly over it and found it all in good order and by this time it had stopped raining and we went south as far as Whiteside, where we found it had not rained a drop. The soil in fact was dusty. Whiteside is about thirty-five miles below this Big

Peno bridge. When inspecting Big Peno bridge between six and seven o'clock, the water was then between two and a half and three feet of the stringers, as we call them, the portion that the ties rest on. This particular bent that went out is fourteen feet from the rails to the ground and towards the bridge they increase to sixteen feet. The nearer the main bridge the longer the bents. I made a subsequent inspection of Big Peno bridge that night. I came back on our regular passenger train and instructed the engineer to stop at both of these bridges and we would inspect the bridges before crossing. At the same time I instructed the section foreman to be out and inspect these bridges and we stopped at both bridges and found them all right. The train was ten or fifteen minutes late at Frankford, it being due there at 9:03. We were on time at Whiteside and my stopping the train at this bridge delayed it, making it a little late at Frankford. This bridge was about two and a half miles from Frankford. The condition of the creek at the bridge when I inspected it at about 9 o'clock as compared with its condition when I went down the road was that the water had receded so it was very shallow and under these bents there was just a little bit flowing. In places you could see the higher portions of the gravel as the lightning would flash. You could see it plainly. I stopped the train and went ahead and looked at the bridge; I was on the engine at the time and got off. I had no lantern. I went ahead and saw the bridge was all right. The section men had just left it and they crossed and I got on the engine and we started. I went on to Frankford where I lived and stayed all night there. I don't remember of it raining any during the night. There was nothing said by anyone of the storm during the night, nor of it having rained. I went to bed at my usual time, about 10 o'clock. The train coming down the next morning going south, Number 1, was on time at Frankford, being about 7 o'clock. I got on the engine of this train at Frankford and sat on the engineer's side with him and

we ran down to the tank and slowed up to let the pump man off, Hardin Stark, and then we started up. As we passed along the side of the stream, I took particular notice of it and saw it in the same condition as I supposed it was the night before. There was drift scattered along at places and it had the appearance of having been up; at that time the water was down within its banks and when we got on to the far end of the bridge it went down. I should judge we were going ten miles an hour. The old water tank was 1,000 feet from the point where the accident occurred. There was nothing whatever, either in the bridge or its appearance to indicate any danger whatever. Being in the position I was, I could see the bridge plainly. The engineer at that time got out of the cab through the front cab window with his oil can to oil the engine at some portion of the works and was just in the act of returning with his hand on the railing and walking on the footboard coming in toward the cab when we went down. All this time while he was out oiling I could see the bridge, and saw nothing wrong with it. Its apearance was as it usually is, just as you see it in the picture there. It was in perfect condition as far as I could see from the cab. Exhibit B represents the correct appearance of the bridge on that occasion as we approached it going south. We first passed over the Howe truss and then we ran over the trestle work and it looked to me just as you see it there. If I had had any intimation that there was anything whatever the matter with it, I assure you gentlemen, I would not have stayed on the engine. In Frankford my residence is about a quarter of a mile from this town branch. I observed nothing that morning to indicate any rise in it. We are largely governed by that in regard to heavy rains. When that is up, we are on the lookout in the immediate vicinity."

Buckwald further testified that he had never seen Peno so high as it was that afternoon, when they passed over it about 7 o'clock. He admitted that he could have seen that the bent was out the next morning, and in answer to a question why he

could not see where the bent was gone the next morning when he went over the bridge, he said: "Because we supposed it was all right, and seeing the bridge all right, we passed over it about ten miles an hour." Asked then if he made any examination of the bridge as he went over, he replied: "We didn't stop and get off and walk over."

Further questions were put to, and answered by Buckwald, as follows:

"Q. You didn't look as you went down from the bridge? A. We didn't have time to look.

"Q. As you approached the place where the bent was out, did you observe or look to see if the bent was out? A. We were going just fast enough not to give me time to think of anything of that kind; it was too late.

"Q. Suppose you had stopped your engine in the morning and walked over it, do you think you could have discovered the bent was out? A. Yes, sir.

"Q. You were in a hurry and supposed the bridge was all right, and went right on? A. Yes, sir."

He further admitted that it was a part of his business and duty as roadmaster to see that the bridge was in proper condition at the time the train went on it, and to this point other witnesses bore testimony.

Respecting the nature, extent and permanency of plaintiff's wounds, the testimony of Dr. Henry A. Geitz, shows these things to be true: "Went directly to Mr. Cobb's house where we found him in bed. Conscious, but found a gash in his forehead and the brain matter oozing. We found a fracture which was a compound fracture (that means it is cut through the skin). There was a fracture in which we found particles of dirt and things of that sort. There was a rip or crack in the bone that extended back over, through a portion of the temporal bone in the back, and you could pass your hand, the fingers through the fracture, through the brain in back of the eye on the inner side of the eye and touch the

nerve that runs from the eye into the brain.   You could pass it downward and touch the ethmoid bone, that is between these two jaw bones.   It was split open.   There is a large sinus that runs across here (that means a large vein) that was split open too, both tables of the skull were cracked, and the brain matter was coming out.   All three membranes that cover the brain, the outer, middle and inner, were torn through and part of the brain matter was oozing out.   This jaw bone was fractured and pressed down and the skull above the eye, this ridge that runs around here, that was splintered and pieces loose in there.   And that together with a region of the facial nerve, a branch of the facial, the supra orbital nerve that runs above the eye, that was paralyzed.   Fragments of the bone were all loose there and you could pass your finger in back there and touch the eye.   The brain matter was coming out and there was dirt in there.   There was hemorrhage of the face and eye lid above swollen.   The patient was given chloroform and the loose fragments and dirt was removed.   We raised a depressed fracture of the upper or frontal bone, using the trephine.   The wound was washed out and cleaned and dressed. I have some of the fragments of bone.   (Witness here produces a small box and displays several small pieces of bone.) There were fourteen.   This is not all; there were other small pieces.   That largest fragment of the bone was a part of this ridge right around the eye, above there.   Some of the smaller fragments were in the eye socket below here and in the nose. This was the piece that we trephined out.   That came out here right above where the depression is.   This smaller fragment is a part of the nasal process.   The result of the irregular fracture was that the bone was broken into pieces, sort of star shape.   We couldn't tell about the inner process of the skull.   I have never seen the patient since the operation was performed, but I have heard of him. I have been connected with the surgical clinic at St. Johns Hospital for almost three years, all the time.   According to the statistics the plaintiff's chances for ultimate and complete

recovery from those injuries are rather indefinite. They are not good. It is very improbable that he will be restored again to perfect health. An injury to the brain and the destruction or loss of a part of the brain matter is irreparable. According to late work by Russell Park, of Buffalo, N. Y., he mentions seventy odd cases of perforations or injuries to the brain itself. There were fourteen survived out of the seventy odd. Out of those fourteen seven had weak sight all the time. Weak sight with constant headache would be included. Any strain of the eye, it being weak, would likely interfere with good health in general. Pain and irritation of the eye causes headache. I have examined the plaintiff and the injured eye is of no value to him, and out of sympathy it may cause trouble with the other eye, and may necessitate the removal of the injured eye to preserve what sight he has in the good one. As to the plaintiff, from experience and experience of others, I would say that his future is very indefinite and that his chances for complete recovery are nil."

Dr. E. C. Hayes, testifying on the same subject, stated: "It was a very grave injury to deal with. It partly destroyed one eye, so far as its use is concerned, which may have to be removed to preserve the other. The effect of the injury upon his general condition is such that I do not think that he is fit or is ever going to be fit for any employment that requires either mental or physical effort. Either will bring on undue excitement and increase circulation and the parts there are in such a condition that they won't bear the tension of the blood vessels, and headache and discomfort will result. The injury to the brain is never repaired in kind. The repair of nature is always done with a lower order of tissue and is always contracting and is liable to bring on epilepsy and ultimately insanity. We don't know. That is about all I can tell you. Mr. Cobb was under the care of Dr. Gleason and myself six or eight weeks."

Dr. John L. Gleason, also as a witness, said: "The result of the injury is that he is not able to do any work. He can not read, because when he attempts to read or write or anything of that kind he gets confused and dazed and suffers pain in his head and headache. When the portion of the brain was removed and the bony structure and the skin of the fissure, it was replaced by what we call a cicatrix or scar that is a different kind of tissue and its tendency is to keep on contracting for years indefinitely, and that causes a pressure on the brain. Statistics warrant me in saying that there is no probability of his ever being able to do anything as any excitement has to be avoided. There will be more trouble mentally than physically. Epilepsy or insanity is to be dreaded from such a wound. His usefulness for life is perfectly nil. That is, so far as a livelihood is concerned."

1. The foregoing evidence has been set forth thus at large, because defendant's counsel assert that its demurrer to the evidence should have been held well taken. This assertion is of a piece with the assertion coming from the same source, respecting the allegations of negligence in the petition, that: "The evidence clearly and emphatically negatives these allegations *in toto*."

The two grounds of negligence thus referred to and charged against the defendant, are these:

First, an unsafe bridge; second, running its train thereon knowing it to be unsafe, or when by the exercise of ordinary care, it could have discovered such unsafe condition.

So that the question thus presented may be compressed into, and formulated in, five words: Did defendant exercise ordinary care?

Touching this subject, and responding to this question, a recent text-book of approved authority, make the following quotation and observation: "What is the precise legal intent of the term 'ordinary care' must, in the nature of things, depend upon the circumstances of each individual case. It is a

relative and not an absolute term. Chancellor WALWORTH, in the case of the Mayor, etc., of New York v. Bailey, 2. Denis 433, says: 'The degree of care and foresight which it is necessary to use' (in any given case) 'must always be in proportion to the nature and magnitude of the injury that will be likely to result from the occurrence which is to be anticipated and guarded against. And it should be that care and prudence which a discreet and cautious individual would, or ought to, use if the whole risk and loss were to be his own exclusively.' This doctrine is declared in many other cases. He who does what is more than ordinarily dangerous, is bound to use more than ordinary care, that is to say, it will require greater care under these circumstances to amount in law to ordinary care than it would if the undertaking were less hazardous. And the measure of diligence required of him is greater or less in the direct ratio of the risk his acts entail upon others." [Beach, Contrib. Neg. (3 Ed.), sec. 21 and cases cited.]

Pursuing the same general line of thought it is elsewhere said: "The degree of vigilance, which the law exacts, by the requirement of ordinary care, must vary with the probable consequences of negligence, and also with the command of means, to avoid injuring others, possessed by the person on whom the obligation is imposed. . . . . . . Under some circumstances a very high degree of vigilance is demanded by the requirement of ordinary care. Where the consquence of negligence will probably be serious injury to others, and where the means of avoiding the infliction of injury upon others are completely within the party's power, ordinary care requires almost the utmost degree of human vigilance and foresight." [Kelsey v. Barney, 2 Kernan loc. cit. 429.]

In other words (paraphrasing the authorities quoted), *it is the exigency of the situation, which acting like heat's action on the mercury in the thermometer, determines to what degree prudence must rise in order to reach the market of ordinary care.*

Here all the testimony shows beyond dispute that the bridge was unsafe, that the stream which it spanned was a turbulent and dangerous stream, subject to sudden floods, which frequently destroyed portions of the bridge; and that the only safe bridge which could be built at the location designated in the pleadings, was one built after the manner heretofore described. And it was the plain duty of defendant, in order to exercise ordinary care, to build a safe bridge at the point indicated; as defendant from long experience knew the dangerous character of the stream and its liability to sudden rises. Knowing these facts, knowing that a great rise had occurred in the stream the night before and not knowing whether or not a heavy rain had fallen after that, between midnight and morning (although that was the fact), it was defendant's bounden duty to make examination of the bridge the next morning and ascertain, before it attempted to cross with its train load of people, that the bridge was not only safe in external appearance, but that a bent of the bridge had not been swept out the night before; something readily ascertainable as shown by the testimony of Ford; and nothing short of this would satisfy the demands of ordinary care.

And the fact, if it was one, that the storm had been unprecedented, affords defendant no excuse, because if a hard rain storm would sweep away the bents, *a fortiori* would one more severe. And the evidence unmistakably shows that had stone piers been used, defendant would have given no cause for the present litigation. The unusual severity of the storm in this instance, instead of furnishing an excuse to defendant, should rather have stuck the spur of vigilance into the flank of its apprehension.

These views dispose of the defendant's demurrer to the evidence in the same way as disposed of by the lower court. That demurrer had no foundation on which to rest, any more than had that portion of defendant's bridge from under which the bent had been swept away. I am not unmindful that

counsel for defendant cite in support of their position, the American Brewing Ass'n v. Talbot, 141 Mo. 674, but that case differs widely from the case at bar in this, that there the fall of the warehouse occurred for the first time, after having stood for six years, and was owing to a hitherto unheard of and excessive rise in the river.

The cases are not at all parallel, for here the fact that "Big Peno" sometimes donned "its Sunday's" had given that creek a well deserved reputation for being dangerous, a reputation that the law will, in the circumstances stated, presume defendant cognizant of, because its duty required it to take cognizance of that matter, and will hold it liable for any lack of that watchful care necessitated by the dangers incident to the situation. In this connection, it is easy to observe that the case just considered is the antipode of one that I am glad to see that counsel for plaintiff have had the good sense as well as good taste, though in their favor, not to cite, to wit: Fuchs v. St. Louis, 133 Mo. 168. That case has not been overruled. *In that case this court by a majority of one, solemnly proclaimed to a wondering world that the city of St. Louis was responsible in damages for negligence, because it did not anticipate and provide against an explosion in a sewer; something which had never been known to occur before!!* Under the ruling in that case defendant would have been responsible even if "Big Peno" had "got its Sunday's on" for the first time in the history of creek and country. Nay more, under the ruling in that case a corporation would be held responsible if injury resulted from its railroad track being swept away by a torrent suddenly bursting forth amid the desert sands of the Great Sahara!

Having dealt with the chief feature and solar plexus of this cause, I will now advert to matters of lesser importance involved in this record.

2. Contention is made that error occurred in instruction number two, given on the part of plaintiff, to wit,

in that portion of the instruction in these words: "his necessary expense for medicines and medical attention in endeavoring to be cured." Plaintiff's testimony on the point was this: "The expense I was put to during my sickness, as near as I can get at it, I did not keep an account, was about $400. This money was expended for nurse and doctors, and expense attached to doctors, ice, medicines, etc."

There was no objection made nor exception saved as to the general character of plaintiff's testimony in this regard, nor was he cross-examined on the subject.

In such circumstances I do not believe that defendant was in a condition to object to the general nature of the instruction in this particular. In Duke v. Railroad, 99 Mo. 347, there was no evidence whatever as to the value of the medical services, nor as to the expenditure of a single dollar in and about that matter, and it was rightly held that an instruction based on such services, had nothing in the evidence to support it, and was consequently erroneous.

In this case, however, there was general evidence on the point in question, and it doubtless would have been made more specific had objection been raised; but it can not be said that there was no evidence on the subject. In Murray v. Railroad, 101 Mo. 236, it was ruled that evidence was not necessary as to the expense for "nursing," as the jury could tell from the length of time plaintiff was in bed, and from their own knowledge as to the value of such services, what they were worth. This case I do not regard as well considered, and it should not be followed.

In Smith v. Railroad, 108 Mo. 243, it was decided that no evidence was given as to the value or charges of the physicians employed and the judgment was reversed on the ground of such failure.

I am unable to see why evidence is any more necessary as to the value of physician's services than as to those of nurses, nor why a jury could any better, without evidence, determine

the value of the latter than of the former. But however that may be, because of the reasons already given, the objection made by defendant to plaintiff's second instruction is held not well taken.

3. Instruction number three given at plaintiff's instance, was correct if the views already expressed in regard to the demurrer to the evidence are to be thus regarded.

4. Plaintiff, under the evidence was not the fellow-servant of those who controlled the movement and operation of the train, and therefore instruction number four given on his behalf, which affirmed that was the law of this case, was not erroneous.

5. Defendant makes contention that plaintiff's fifth instruction was wrong because there was not a scintilla of evidence that the bridge "was not constructed in an ordinary and reasonably safe manner." This contention is answered by the evidence in the record, hereinbefore set forth, as well as by remarks heretofore made in paragraph one of this opinion.

6. Very favorable instructions were given as asked by defendant, and those refused asked by it were properly refused, either as having been covered by previous instructions or as being opposed by the evidence.

7. Defendant urges that error was committed in permitting Locking to testify as an expert in regard to the unsafeness of the bridge.

Locking, though unacquainted with the *locus in quo*, still was competent to testify as an expert from hearing other witnesses testify who were thus acquainted. [State v. Meyers, 99 Mo. loc. cit 121, and cases cited.]

8. Finally it is insisted the damages awarded are excessive. A young man, twenty-seven years of age, strong and healthy, has received irreparable injury by reason of the accident; has been made a mental and physical wreck in consequence of the two-fold negligence of defendant in failing to build a safe bridge for the locality, it being in its power to do

so, and in failing to ascertain the condition of the unsafe bridge on the morning of the accident, something also entirely within its power to perform, as well as its duty to perform.

The result of these views is that the judgment should be affirmed. All concur.