BESSIE GRODSKY, Appellant, v. CONSOLIDATED BAG COMPANY and PHILIP LEVINE.—26 S. W. (2d) 618.

Division One, April 2, 1930.

1068 .

*Abbott, Fauntleroy, Cullen & Edwards* for plaintiff.

*Foristel, Mudd, Blair & Habenicht* for respondents.

ATWOOD, P. J.—This is an action for personal injuries and specified expenses growing out of an automobile collision wherein plaintiff sought damages in the sum of $25,000. A verdict was rendered in her favor in the sum of $1,000. From the judgment entered thereon plaintiff has appealed on the grounds of inadequacy, error in giving an instruction and error in the admission of evidence.

Plaintiff went to trial on her second amended petition alleging that she was injured on July 13, 1922, while riding in an automobile belonging to defendant Consolidated Bag Company, a corporation, on a trip from St. Louis to Chicago; that said automobile was in charge of and directed by defendant Levine who was the chief managing officer of said corporation; that when near the town of Watseka, Illinois, said automobile was so carelessly and negligently driven by defendants, their agents, servants and employees, that a collision occurred with a truck upon the highway, directly resulting in certain serious and permanent injuries to her. Defendant corporation filed answer in the nature of a general denial, and codefendant Levine, after generally denying the allegations of the petition, set up contributory negligence on the part of plaintiff in failing to protest against or warn the driver of the automobile of the speed complained of, and of the impending danger of collision. Plaintiff replied to each answer with a general denial.

It appears from the evidence that defendant corporation owned the car and that defendant Levine, intending in its behalf to make a trip from St. Louis to Chicago, invited plaintiff to ride in the

car with him and his sister. The fourth occupant of the car was the driver, Jack Grodsky, who was an employee of defendant corporation. Inasmuch as the jury found for plaintiff and defendants have not appealed, a statement of the evidence tending to show liability is not deemed material to the issues here raised.

The gravamen of this appeal is the inadequacy of plaintiff's judgment. This complaint appears in her motion for a new trial, in her first and second specifications of error, and in the first point urged on this appeal. Other grounds of error are also urged and they will be considered first. One is set forth in the second point in appellant's brief, as follows:

"The court erred in instructing the jury that all plaintiff could recover on account of surgical and medical bills, medicines and medical attention, hospitals, etc., should not exceed $839, because the uncontradicted evidence tended to prove that she paid and became liable for a much larger sum than $839."

The matter here complained of is the action of the court in modifying plaintiff's offered instruction by inserting the words, "if any not exceeding the sum of $839 for this item," appearing in parentheses in the following instruction numbered 12:

"The court instructs the jury that if, under other instructions of the court, you find for the plaintiff, then, in assessing her damages, you may take into consideration the nature of whatever injuries you may find and believe from the evidence plaintiff sustained on account of her pelvis bones having been broken and on account of any bruises and contusions about her back, as a direct result of the collision mentioned in the evidence, whether or not said injuries, if any, will endure in the future, and, if so, for what length of time they will so endure, if at all, whatever pain of body or anguish of mind, if any, plaintiff sustained as a direct result of said injuries, if any, whatever pain of body or anguish of mind, if any, plaintiff will in the future necessarily suffer, if at all, by reason of said injuries, if any, such sums as she has necessarily laid out and expended or become obligated to pay for medical and surgical attention on account of said injury (if any not exceeding the sum of $839 for this item) your total verdict to represent a fair pecuniary compensation to plaintiff for the matters and things hereinabove enumerated."

It will be observed that the item referred to in this instruction, upon which the amount of recovery was limited to $839, consists of "medical and surgical attention" and not "surgical and medical bills, medicine and medical attention, hospitals," etc., as above stated in appellant's second point and substantially as pleaded in her petition. Looking to the record for proof of expenditures made

or obligations incurred by plaintiff for "medical and surgical attention" we find that plaintiff identified receipted bills, and testified that they represented expenditures incurred because of her alleged injuries, as follows:

"Exhibit 1. Hospital bill at Iroquois Hospital up to August 26, $194.90.

"Exhibit 2. Bill for ambulance in St. Louis that took me from the station, $25.

"Exhibit 3. Rent on invalid bed to September 15, $15. Rent on bed, $12, total, $27.

"Exhibit 4. Bill in favor of Dr. George W. Ross (and Dr. White), for services at hospital in Illinois, $300.

"Exhibit 5. Dr. Titterington, bill for services in February, 1924, for taking X-rays, $45.

"Exhibit 6. Bill in favor of L. B. Segur for hire of ambulance from the hospital in Watseka to the train, $10.

"Exhibit 7. Bill of Warner Brothers Moving and Storage Company for removing furniture to make a place in home where I could receive proper treatment, $24."

Exhibit 1 really falls under the head of "hospitals" pleaded, but such service is so essential to "medical and surgical attention" that it may be deemed within the scope of this instruction. However, Exhibits 2, 3, 6 and 7 do not come within that classification. Plaintiff also testified that her mother and sister nursed and stayed with her constantly, but no value was fixed or expenditure shown for such service, and expense of nursing was not pleaded or mentioned in this instruction. Murray v. Mo. Pac. Ry. Co., 101 Mo. 236, 240, 13 S. W. 817, and Cobb v. Ry. Co., 149 Mo. 609, 630, 50 S. W. 894, cited by appellant, are not in point. The same may be said of expenses which plaintiff testified generally were incurred by them, as well as her railroad fare on her return trip to St. Louis. In connection with Exhibit 4, Dr. Ross and Dr. White testified that this bill of $300 was paid them for medical services and Dr. White said it was a reasonable charge. Exhibit 5, being receipted bill for $45 from Dr. Titterington for taking X-ray pictures probably falls under the head of "medical and surgical attention;" also, $100 testified to by plaintiff as traveling expenses of Dr. Dardin who accompanied plaintiff from the hospital in Illinois to St. Louis; also, charge of $100 each by Dr. O'Reilly and Dr. Horwitz for medical services, shown to be reasonable. It thus appears that expenses properly within the class limited by Instruction 12 total $839.90, and plaintiff was not substantially hurt by the court's limitation of recovery for "medical and surgical attention" to $839.

The third point urged in appellant's brief is as follows:

"The court erred in admitting immaterial evidence and in compelling the plaintiff to be interrogated on immaterial matters, and mere matters of opinion, and erred in permitting the defendant to introduce evidence tending to contradict such immaterial evidence and statement of opinion."

These objections can only be considered to the extent that they are raised by the second ground stated in plaintiff's motion for a new trial, which is that the court "erred in admitting testimony offered by defendant," and then only where the record shows proper objection was made.

Under sub-head (a) appellant complains of her cross-examination in certain particulars and the subsequent introduction in evidence of that part of a written statement made by plaintiff prior to the trial which read: "It is my opinion that the truck driver was entirely responsible for the accident." No question as to the manner of plaintiff's cross-examination is raised in her motion for a new trial. Relative to the admission of this statement in evidence, it appears that plaintiff was asked if she did not sign a certain statement prepared by representatives of the Aetna Insurance Company. She admitted that she did, but claimed that she was so ill that she did not know the significance of what she was doing. During her cross-examination relative to this statement the following transpired:

"Q. Did you tell him it was your opinion that the driver of the truck was entirely responsible for the accident? A. I certainly didn't.

"Q. How? A. I certainly did not.

"Mr. CULLEN: Wait a minute, we object to any expression of the opinion of this witness.

"Mr. FORISTEL: That would be in contradiction of her testimony here if she made a statement that the driver of that truck was entirely to blame.

"Mr. CULLEN: Any expression of opinion is not testimony.

"Mr. FORISTEL: But here is a declaration against interest from a plaintiff.

"Mr. CULLEN: It is not a declaration against interest.

"THE COURT: Objection overruled.

"To which ruling by the court, the plaintiff, by her counsel, then and there excepted at the time and still excepts.

"Mr. FORISTEL: You told him, 'It is my opinion the truck driver was entirely responsible for the accident?' A. I did not tell him that; no sir."

Thereafter counsel for defendant offered this written statement in evidence as Exhibit No. 2, and again we quote from the record relative thereto;

"MR. FORISTEL: I next offer a paper which has been marked Exhibit 2.

"MR. CULLEN: The matter marked in parentheses is a matter of opinion.

"THE COURT: Objection overruled.

"MR. CULLEN: Save my exception.

"To which ruling by the court, the plaintiff, by her counsel, then and there excepted at the time and still excepts.

"MR. FORISTEL: In that connection, I desire to offer Defendant's Exhibit No. 1 (2).

"(Which said Exhibit No. 1 (2), here offered in evidence, being a paper containing the signatures of plaintiff for comparison, is hereto attached and made a part of this record, as follows:)

"MR. FORISTEL: Exhibit No. 2, gentlemen, is as follows:

"(Defendant's Exhibit No. 2 was here read to the jury by Mr. Foristel, the same being and appearing in the words and figures following:)

" 'Watseka, Ill., July 18, 1922.

" 'My name is Bess Grodsky, age 28 years, residence 5795 Pershing Ave., St. Louis, Mo., single, not working, home girl. At the time of the occurrence about 10:50 A. M., July 13, 1922, I was sitting in Marmon car, en route to Chicago, which car was struck by International truck. I read statement of Jack Grodsky, and the facts therein contained are as I know them. (It is my opinion truck driver was entirely responsible for the accident.) I was injured and at present am at Irquois Hospital, Watseka, Ill. Drs. White and Ross are takcare of me. I do not know how long I will be in hospital. My injury is in my back from hip down. There are bones broken, but just what portion of body I am unable to state. I have read my foregoing statement and the facts therein stated are true and correct.

" 'BESS GRODSKY.

" 'Attest:
" 'John A. Shealy,
" 'W. C. Hesslau.' "

The clause was evidently admitted as a declaration against interest made by a party to the action. Appellant's objection was and is that it was inadmissible because it was opinion evidence. There is a clear distinction as to admissibility of declarations by a witness not a party to the action, as in Sweeney v. Ry. Co., 150 Mo. 385, 400, 51 S. W. 682, cited by appellant, and declarations against interest by a party to the action. See Bank v. Nichols, 202 Mo. 309, 324, 100 S. W. 613. In Wigmore on Evidence (2 Ed.) sec. 1053, it is said as to this class of evidence:

"A primary use and effect of an admission is to discredit a party's claim by exhibiting his inconsistent other utterances. It is therefore

immaterial whether these other utterances would have been independently receivable as the testimony of a qualified witness. It is their inconsistency with the party's present claim that gives them logical force. . . .

"Since a party may make a claim and file averment of pleadings without regard to personal knowledge of the facts, it is fallacious to exact, in his contrary admissions, an element of personal knowledge which is not required for the original advancement of his claim. Such a requirement is repudiated in the better judicial view. . . .

"The *Opinion Rule* (post, Sec. 1917) does not limit the use of a party's admissions. The reason for that rule does not apply to a party's admissions. Moreover, every case presented in the allegations of pleadings and witnesses includes both facts and inferences; hence, the opponent's admissions will naturally range over both facts and inferences without distinction, e. g. as when a debtor's letter admits that he owes $20 out of the $45 claimed by the creditor. To extend the arbitrary trivialities of the Opinion Rule to parties' admissions would be the extreme of futility."

In 1 Ruling Case Law, 468, it is said that a witness may "testify to assertions made by another person, whenever it appears that the statements were against or in conflict with the facts asserted by him in a judicial proceeding." In Nichols Applied Evidence, vol. I, p. 579, it is said: "Declarations of injured person that injury was his own fault are admissible." Such holdings appear in Rudd v. Byrnes, 156 Cal. 636; Bush v. Barnett, 96 Cal. 202; Gulzoni v. Tyler, 64 Cal. 334; Lord v. Pueblo Smelting & Refining Co., 12 Colo. 390; Peterson v. Silver Peak, 37 Nev. 117, 131. In the early case of Sparr v. Wellman, 11 Mo. 230, 234, we said that "where a party believes a fact upon evidence sufficient to convince him of its existence, his declaration of the existence of that fact, if against his interest, is evidence against him." In Black v. Epstein, 221 Mo. 286, 303, 120 S. W. 754, we said that "any statements which may have been made by a party to a suit against his interest, touching material facts, are competent as original testimony." Also, in Forrister v. Sullivan, 231 Mo. 345, 378, 132 S. W. 722: "We know of no exception to the principle of law allowing admissions of a party to a suit made against his interest to go in against him, absent an express statute forbidding it." See, also, Green v. Railroad, 211 Mo. 18, 36, 109 S. W. 715; Brookfield v. Drury College, 139 Mo. App. 339, 367, 123 S. W. 86; and Friedman v. United Rys. Co., 293 Mo. 235, 244, 238 S. W. 1074.

Plaintiff's statement that it was her "opinion the truck driver was entirely responsible for the accident" was inconsistent with her subsequent action in attempting to place the blame upon other parties. The trial court did not err in admitting the statement.

Under sub-heads (b) and (c), and in Point I.V, counsel for appellant complain that she was persistently cross-examined relative to what she and her companions did and the rate of speed at which the car was being driven on the first day of their trip (the day before the collision occurred), and her own experience in driving cars, and that her testimony given at a former trial was introduced in evidence as contradictory admissions. These matters were reasonably within the scope of proper cross-examination and contradiction. It does appear from the cross-examination of plaintiff and some of her witnesses that certain facts, such as her father's ownership of an expensive car, the nature of his business, and her own race and foreign birth, were suggested and stressed in a manner more likely to create prejudice against plaintiff than to serve the legitimate purposes of cross-examination. However, the trial court was in position to observe the effect of the facts so elicited, and we are not inclined to hold that reversible error was committed in overruling objections then and there made in behalf of plaintiff, but will later consider the prejudicial trend of such cross-examination in connection with the exceedingly small verdict returned.

Coming back to plaintiff's first contention, namely, that the judgment is so inadequate that it should be reversed and the cause remanded, we shall briefly review the testimony as to her injuries.

Dr. Jacob J. Singer, of University City, Missouri, testified that he was traveling some distance in the rear of the car in which plaintiff was riding, heard the crash, and saw two machines piled up in the road. He said that he found plaintiff lying in between the broken seats and the tonneau of the car and more or less unconscious.

Dr. George W. Ross, a physician and surgeon residing at Watseka, Illinois, said: "Miss Grodsky was brought into the hospital by Dr. White, of Martinton. I examined her on July 13, 1922. An examination revealed a suspicion of a fractured pelvis. An X-ray examination following confirmed the suspicion. When I first examined the patient there was evidence of crepitus; severe pain on pressure and slight false motion. She was in the Iroquois Hospital for six weeks following the injury. When I made my first examination she was suffering severe pain. I gave her the usual treatment for fracture, rest and immobilization. She was placed in a cast and was in the cast when she left the hospital. X-ray photos were taken at the hospital. I was present when they were taken." He thereupon identified X-ray pictures marked Exhibits A, B, C and D, and continued to testify as follows: "Exhibit A shows a fracture of ilium just at the acetabulum and another ischium. The first fracture is on the left side and the fracture of the ischium on the right side. The picture al-

so shows quite a wide separation of the symphysis. Exhibit B is another picture of the same patient showing the same thing. Exhibit C is a picture of the pelvis showing fractures described previously. Exhibit D shows same injuries as the others, except it was taken with the patient on her face. There was a fracture at the acetabulum; a fracture on the left side. There was a fracture of the ischium on the right side and there was a separation of the symphysis median line. If there was a bony ossification there previously there was a fracture at that point. Other X-ray pictures were taken of the patient while she was in the hospital. In my opinion there would be permanent effects from the injuries which this patient suffered. A fracture of the acetabulum would tend to limit motion of the hips. That would be permanent. A repair of a fracture of this kind would narrow the pelvis and pelvic outlet, which would interfere with any subsequent childbirth. There would be a narrowing of the pelvis. The degree of narrowing would depend on whether or not it was possible for her to deliver a child normally. From my experience, fractures of the pelvis result in operative delivery of children subsequently.''

Dr. Minor E. White testified that he was called to the scene of the accident, found plaintiff lying in the road, had her removed to the hospital at Watseka, was present when the X-ray pictures were taken, and examined them immediately after they were taken. He examined the pictures in the presence of the jury and gave substantially the same testimony concerning them as was given by Dr. Ross.

Dr. Archer O'Reilly, after qualifying as a specialist in diseases and injuries of the bones and joints, testified that plaintiff's father consulted him in July, 1922, about her injuries; that he was called to see her in August; that he saw her approximately twelve times; that when he first saw her she was lying in bed and was having a great deal of pain in her back and hip, so much so that it was rather difficult to move her. The witness examined plaintiff's X-ray pictures marked Plaintiff's Exhibits A, B, C and D in the presence of the jury and testified with reference thereto as follows: ''They show fractures of the pelvis. There are two fractures on one side through the ramus of the ischium, both ramus, or through the rami on one side. A fracture of this bone here. (Witness indicating to jury on X-ray picture.) Another fracture through here. And one—at this one side there is a fracture here, and it looks as if there was a fracture there; possibly a little chip off that upper portion there; I don't know that that means anything. It is fractured through here, and one through that bone; a fracture here and another fracture there. The ischium was fractured—rami of the ischium, both sides. It was a complete break; the bone entirely broken. It looks as if it were in the X-rays. The office of those bones that are fractured support the pelvis; they support the rami of the pelvis, the portion of the

anatomy to which the hip bones are attached to the thighs, and which support the spine, the body and trunk.'' As to the nature, severity and extent of the pains resulting from plaintiff's injuries this witness said: ''Those pains are apt to be quite severe because supporting surfaces between the pelvic bones, the ilia, which is a part of the pelvis, and the sacrum, which is a part of the spine, are disturbed and they will—all abnormal motions set up irritations in the lumbar spine and in the back around the sacroiliac joints, and motions and movements and stoopings, and sometimes lying down is very uncomfortable. . . . I think the ill effects in this case are that as the result of the crushing, as the result of the fracturing, there was a disturbance of the sacroiliac joints, and probably some slight displacement that would not show in an X-ray, but which is very apt to be present in any case, and I think that sets up a definite strain in the back which may be very persistent and may last for several years, or longer.''

Dr. Alexander E. Horwitz qualified as a specialist in orthopedic surgery, and testified that he first saw plaintiff in September, 1922, at her home. He said that she was in bed, that he made an examination, had X-ray pictures taken and saw her three times in September; that manipulations of the body and limbs were painful, that there was a tender area over the pelvis, and that the X-ray pictures showed numerous fractures. He further testified that ''there were two fractures on each side—the two bones that go up from the pelvis, the lower portion of it the pubis and the ischium; there was a fracture at each one of those on the right side, each, and one on the left side; and the X-ray showed a distortion of the pelvis, the sacroiliac joint on one side being much larger and broader than the corresponding joint on the other side. And at the symphysis, in front, where the two halves of the pelvis come together, there had been apparently a tearing or stretching of the ligaments holding that joint together, and they were fairly widely separated and the edges appeared to be rough. They are all good sized bones. The pubic bones are pretty large. They vary in different areas and breadth. In some parts they are possibly as wide as the finger and spread out to the width of two fingers. There are two separate bones on each side, and each of those bones on each side are the size I have indicated. There were four different bones broken. And then the fastening together of the—each side of the body, you might say, generally speaking—that was wrenched loose. In the front the ligament torn loose is called the pubic ligament, the ligament holding the public bones together. And in the back the sacroiliac ligaments. A broken bone that bears any weight on it is very painful, and in the pelvis where there had been four breaks of that kind, moving the body or jarring causes pain; and then on the inside of the pelvis

about those points there are large nerves going through, and if those nerves are pressed upon or touched upon by the fragments it is very painful. There is usually pain beginning with the time of the injury and lasts until the healing is complete. The effect upon the patient in an injury of this kind I think would depend more upon the distortion of the pelvis than upon the actual fractures. The pelvis being distorted, after the patient is able to be up and about the weight bearing is not symmetrical or even, or evenly distributed; more drag and strain on one side of the body than there is on the other, and there is constant resultant pain from that. With the distortion of the pelvis in that kind of a case it produces a backache on account of the constant dragging in the uneven distribution of the weight upon that part of the body.''

Plaintiff testified that her injuries were very painful; that about a week after she was taken to the hospital at Watseka she was placed in a plaster cast extending from below the chest all the way down to the left foot, one foot being left free; that she suffered acute pain almost continuously during the six weeks she remained there in the hospital; that on August 26th she was still in the cast and was strapped to a stretcher and removed to her home in St. Louis, Missouri; that two or three weeks thereafter the cast became so painful that it was removed. Disinterested parties testified that plaintiff was confined to her bed and apparently suffered much pain for several months after she was brought home. At the time of the trial, nearly three years after the accident occurred, she testified that she still suffered continuously from headache, backache, sleeplessness and extreme nervousness, troubles which she had never experienced before she was injured.

Notwithstanding the above evidence, which defendants did not attempt to minimize or contradict by countervailing proof, the jury returned a verdict for plaintiff for $1,000, which according to the uncontradicted evidence is less than $200 in excess of the amount of money actually expended for her ''medical and surgical attention'' as specified in above Instruction 12. Plaintiff's pecuniary damage susceptible of computation under the language of this instruction, which was not as broad as the pleadings and proof, thus amounted without contradiction to more than $800, and we are presented with the amazing spectacle of an award of less than $200 as adequate compensation for serious, extraordinarily painful, and probably permanent injuries accompanied by many months of total disability and suffering, shown by an abundance of competent, disinterested testimony, fair on its face, of probative value, and wholly uncontradicted. The verdict is shockingly inadequate. Counsel for defendants say that ''had the trial court set the verdict aside, its action would be beyond reach;'' but because the trial court refused

to do so does it follow that the judgment for this ridiculous amount must stand? In Pritchard v. Hewitt, 91 Mo. 547, 551, 4 S. W. 437, though affirming the judgment of the trial court, we recognized the right and duty of an appellate court to reverse and remand in "those cases where the damages, under the circumstances, are such as to shock the 'understanding,' and induce the conviction that the verdict was the result of either passion, prejudice, or partiality," citing 1 Graham and Waterman on New Trials (2 Ed.) 451, where it is said that courts should interpose when "the result of the deliberation of the jury appears in a form calculated to shock the understanding and impress no dubious conviction of their prejudice and passion."

In Fischer v. St. Louis, 189 Mo. 567, 578, 88 S. W. 82, this court, speaking through LAMM, J., said:

" 'Raking in the dead ashes of antiquated cases,' to borrow the animated language of Chancellor KENT in discussing the earlier cases pertaining to the rule in Shelley's case, it may be found that a notion once prevailed that in an action founded in damages sounding in tort, the court might set aside a verdict excessively great as indicating passion, prejudice or misconduct on the part of a jury, but would not meddle with a verdict immoderately small. This doctrine was illogical and, being based on no substantial reason, is exploded. The true rule seems to be that a court with great hesitation will invade the province of a jury and interfere with a verdict for damages sounding in tort for personal injuries, crim. con., seduction, slander, libel and other cases, especially where malice is an element and smart money or exemplary damages are allowed. But judges have never renounced their right, as an element in the administration of the law, to set aside a verdict, either excessive in bigness or ridiculous in littleness, where the result reached shocks the understanding and cannot be fairly justified on any hypothesis except misconduct or prejudice or willful disregard of instructions."

In 2 Sutherland on Damages (4 Ed.) pages 1497-8-9, it is said:

"In cases where there is no legal standard of damages, if the appellate court does not find error in the admission or rejection of evidence or in the instructions, the objection that the amount awarded by the jury is excessive or insufficient is not generally available, especially in the absence of proof of pecuniary loss. If, however, on the nature of the case or on a proper return of all the testimony the point can be raised in the appellate court, as under the practice in many states it may, it clearly appears that the damages found are excessive or insufficient, the judgment will be reversed on that ground."

In 4 Sedgwick on Damages (9 Ed.) page 2752, it is said that "it is now settled that a verdict will be set aside as inadequate for the

same reasons that justify setting a verdict aside if excessive." See, also, Bauer on Damages, sec. 29, p. 89; Ford v. Ry. Co., 8 Ann. Cas. 902, and note; Leavitt v. Dow, 17 Ann. Cas. 1072, and note; Doody v. Railroad, Ann. Cas. 1914C, 846, and note; 8 R. C. L. 681; 46 C. J. 210.

Counsel for respondents finally concede that on the authorities appellate courts are shown to have the power "to interfere with verdicts and direct that they be set aside alike for excess and inadequacy," but argue with penetration and acumen that "appellate courts on appeal in such cases proceed upon quite different principles and rules in cases where the complaint is respectively of excessive or of inadequate damages." Setting up the proposition that "in no case may an appellate court appraise the weight and credibility of *the evidence of injury* and *determine or fix the amount* of damages properly to be awarded," counsel proceed to defend our practice of ordering a *remittitur* as an exercise of proper authority to determine as a matter of law "that there is *no evidence in the case* from which the jury might reasonably have found injuries of such nature and extent as justified the award which the jury returned in its verdict," and conclude that the same principle cannot be applied in case of an inadequate verdict. The reasons underlying the practice of ordering a *remittitur* are ably discussed by BLACK, C. J., in Burdict v. Ry. Co., 123 Mo. 221, 238-43, 27 S. W. 453, but whether or not they can be so applied as to justify an order increasing an inadequate judgment to a fixed amount is not the matter now before us. The exact question is whether or not this judgment should be reversed and the case remanded for a new trial. In case of grossly excessive verdicts we have not hesitated to reverse and remand upon the sole ground that such a verdict could only be explained as the result of passion, partiality or prejudice. [Adams v. Ry. Co., 100 Mo. 555, 570, 12 S. W. 637, 13 S. W. 509; Partello v. Railroad, 217 Mo. 645, 659, 117 S. W. 1138; Busse v. White, 302 Mo. 672, 681, 259 S. W. 458.] If as indicated by the current weight of authority, "no reason can be given for setting aside verdicts because of excessive damages, which does not apply to cases of inadequate damages" (17 Ann. Cas. 1072, supra), we are unable to follow the course of respondents' argument. We are mindful of the fact that this court has generally held that in actions for damages judgment would not be set aside on the sole ground of inadequacy (Gregory v. Chambers, 78 Mo. 294; Pritchard v. Hewitt, 91 Mo. 547, 550, 4 S. W. 437; Dowd v. Air Brake Co., 132 Mo. 579, 582, 34 S. W. 493; Cochran v. Wilson, 287 Mo. 210, 230, 229 S. W. 1050), but this rule is subject to the well recognized exception, above noted, that appellate courts will interfere when upon a consideration of the whole record the judgment is so shockingly inadequate that it can be explained

only as the result of passion, partiality or prejudice. If, on appeal, the verdict can be reasonably accounted for on the theory that the jury believed only enough of plaintiff's evidence to fix liability, the exception by its terms would not apply. Sometimes the condition of the record in a case admits of no such explanation, as where it appears that defendant expressly conceded the nature and extent of plaintiff's injuries, or where they were so obvious that their mere ocular presentation to the jury amounted to proof as a matter of law. [Craton v. Huntzinger, 187 S. W. (Mo. Sup.) 48, 52.] And when from its consideration of the size of a verdict, whether great or small, in connection with matters of record having a prejudicial tendency, an appellate court may conclude that the judgment should be reversed and the cause remanded for a new trial, the province of the jury is not invaded. While the record in this case does not show that defendant expressly conceded the character and extent of plaintiff's injuries, or that their most serious features were or could have been directly presented for ocular observation by the jury, yet plaintiff's evidence was full and fair on its face and not contradicted. Although not conclusive as a matter of law it was probably as near so as the circumstances of the case would permit. The cross-examination of plaintiff was conducted in certain respects, already observed in a manner more calculated to arouse passion and prejudice against plaintiff than to throw light on the issues involved. We are convinced that the sinister influences thus invited entered into the case and are reflected in the extremely inadequate verdict returned.

In the Fischer case, supra, the judgment was for one dollar. In other cases so ruled the judgment was for nominal damages, and counsel for defendants insist that there should be a distinction "between cases where the jury returns a verdict for nominal damages and those in which the jury awards substantial, though inadequate, damages." The argument advanced and cases cited are by no means convincing. We find no such artificial distinction suggested in cases where the point is directly involved. In Boggess v. Ry. Co., 118 Mo. 328, 23 S. W. 159, 24 S. W. 210, plaintiff sued for $20,000, was awarded $1,000, and appealed. Evidence in his behalf showed that by reason of his injuries he was confined to his room over fifty days, suffered sharp pain in his ankle and foot at the time and ever since, took medicine to alleviate the pain and induce sleep for four or five weeks; that some of the ligaments were torn and blood vessels injured, some ruptured—no bones were broken—the most serious injury being in the ankle joint; that the injury was permanent and he would always have to use a crutch or cane. There was no evidence of expense for medicine or medical attendance nor of the value of time lost; and there was evidence tending to prove that from April following his injury in January of the same year plaintiff attended

regularly to his business as a lawyer. The trial court's judgment refusing to grant a new trial was affirmed on the ground that the judgment was not such as to shock the sense of justice or force the conviction that it was the result of passion, partiality or prejudice, but there was not the slightest suggestion that the appellate court's discretion to reverse and remand should only be exercised where nominal damages are awarded. Such an arbitrary distinction would destroy the reasonableness of the rule.

Upon the grounds above stated the judgment is reversed and the cause remanded for a new trial. All concur.