DONALD WILHELM, a Minor by his Next Friend, his Mother, HELEN WILHEIM, Appellant, v. KANSAS CITY PUBLIC SERVICE COMPANY, a Corporation, Respondent.—No. 40592.—212 S. W. (2d) 915.

Division One, July 12, 1948.

*Cyril G. Baucke* and *Walter J. Gresham* for appellant.

*Charles L. Carr, Frank J. Rogers* and *Cooper, Neel, Sutherland & Rogers* for respondent.

[915] DALTON, C.—Action for $25,000 damages for personal injuries alleged to have been occasioned by defendant's negligence in the operation of a street car. The jury returned a verdict for plaintiff for $1,000 upon which judgment was entered, plaintiff's motion for a new trial was overruled and plaintiff appealed.

Plaintiff suffered a fracture of the pelvis and injuries to his bladder on November 3, 1943, when the automobile in which he was riding was struck by one of defendant's street cars. The action was instituted December 1, 1943, but was not tried until 1947. The cause was submitted on negligence [916] under the humanitarian doctrine and a verdict returned, as stated, on April 17, 1947. Plaintiff-appellant assigns error on the admission of evidence and on an alleged inadequate verdict. We will consider the assignments in the order mentioned.

Appellant was in the United States Marine Corps and was on authorized leave at the time he was injured. He was taken to a government hospital at the Naval Air Station, Olathe, Kansas, for treatment. He remained there until December 28, 1943, when he was discharged for active duty. In the trial, he called Vergil E. Willis, as his witness, and showed that the witness had been employed by the Veterans Administration at Kansas City, Missouri, for 19 years. He further showed by the witness that the Veterans Administration is "a Department of the Federal Government that administers all laws relating to Veterans, their dependents, widows and orphans"; that the records appertaining to the appellant, which records the witness was required to produce, was a file "containing certain government records pertaining to a Mr. Wilhelm, including some records of the Veterans Administration—photostatic copies of hospitalization, rate sheets and correspondence, awards of pension, and material of that kind"; that the records were a part of appellant's "claim file" and were permanent records kept by the Veterans Administration; that some of the records were originals and some copies; that the original hospital records of the Navy "would be with the Navy Department" and only copies were in the file; and that the file was used by the Veterans Administration as to any accident or claim that might be made by appellant. The witness further testified that the file and records were kept "for whatever reason we may need them"; that the file contained appellant's physical examination record, and "the first record relates to hospitalization at Olathe, Kansas, outside of the war, I think this means, and the other, is in the service"; that the whole file referred to appellant; and that, if the veteran "moves to another area, the whole file is transferred at his request." Witness was then requested to read from these records

as to appellant's weight, height, etc., and was permitted to comment "that is when he goes in." As the records were read, other comments were requested of or made by the witness with reference to the records in his possession. By consent, the witness was asked whether the file showed a complete record of all medical treatment given appellant and if all would be in the file. He replied: "They would be, in my opinion. I don't make these records, but I know from being in this work there are many more records than are here; for instance, they would have a fellow's temperature taken several times a day, and many other details, but they don't photostat all that, and send it to us." The record showed that appellant was on authorized leave when injured in the automobile accident; and that his injuries did not result from intoxication or misconduct.

The witness was cross-examined about the medical report he had read concerning appellant's physical condition on November 7, 1945 towit: "Examined this date and found physically qualified for honorable discharge by reason of the convenience of the government." Respondent's counsel asked: "Q. Well, have you been in association with this kind of work long enough to tell this jury what is meant by 'physically qualified for honorable discharge?' Mr. Baucke: If your Honor please we object to that, for the reason he is asking for a conclusion and opinion, and the record speaks for itself. I think it is highly improper and immaterial. The Court: Let him answer. A. Well, it seems that this man is in physical shape so that he can be discharged; that he doesn't need any further medical treatment; that he is in line for discharge; that he doesn't need any further medical treatment at this time. . . . Q. Well, do you have a file showing him examined for a pension, or findings on that? A. No examination, but he was rated on his service records." The witness then read the records showing appellant's service rating as of December 6, 1945, a combined rating of 50% [917] disability on account of gunshot wounds, and the cross-examination proceeded: "Q. Now, had the Rating Board determined that this man had any disability from his pelvic condition, would he have been allowed a rating on that, and been given a pension on that? Mr. Baucker: We object to his opinion on what the Rating Board might do, as a mere conclusion on his part—what the Rating Board might have done. The Court: Let him answer the question. A. His service connection for this pelvic condition, they rated it at no per cent. If it had been 10% or more, in their opinion, they would have rated it so. Q. (Mr. Rogers) Does this man draw a pension for his disability? A. Yes, he draws a pension. He draws at this time $69.00 a month. That is on his gunshot wounds, you understand. Q. And no dollars per month for any other disability? A. No, he just draws on the gunshot wounds. . . . Q. Now, if I understand you, Mr. Willis, a soldier who is on furlough and who receives some injury, is it

the practice of the army to consider that disabling injury that he receives on furlough, in figuring the amount of his pension that they will pay him? Mr. Baucke: We renew our objection, he is asking for a conclusion and opinion on his part—merely presumptive. The Court: Let him answer. A. The army is not paying, it is the Veterans Administration, and under our regulations, when he is hurt, not the result of his own misconduct, on furlough, that man has service connection connected with his naval service—he has a service connection. Q. (Mr. Rogers) . . . Does it show the recent treatment of this man? A. No. Q. If he had received treatment recently, would it appear in that? Mr. Baucke: I object again—he is asking for a conclusion and opinion. The Court: Let him answer. A. Well, it depends on where he got the treatment; if we ordered him examined, we would have, it would be in here, but there is no examination report. We made a request to Wadsworth, and it was entered in here. Q. (Mr. Rogers) When was it? A. February 12, 1947. Q. And how long does it take you to hear from Wadsworth? A. Your guess is as good as mine. Depends on their business, etc., whether the man has been examined. Q. Well, your records do not show whether he went to Wadsworth? A. It doesn't show.''

Subsequently, in reply to a question by appellant's counsel, the witness stated: ''A. The first thing, in order to draw a pension, you have to have service connection for the disability; it has to be connected with your navy service and it is either 10% or some other per-cent. If at some time that service connected disability gets better, they can discontinue paying him, or increase him, as his disability changes.'' Concerning his final medical examination and discharge at Chicago, November 7, 1945, appellant testified: ''Q. Did you make any complaints about your bladder or improper elimination of your urine, when you were in Chicago? A. No, they would have kept me there. . . . No, if I had told them about that they would have kept me there, and wouldn't discharge me.''

Appellant now contends that the court erred in admitting the testimony to which he objected. The ground assigned is that the witness was *not qualified* to express an opinion of the meaning of the phrases used in the records, or what the rating board might have thought and done concerning appellant's condition; that he was not *competent* to construe the language of the record; and that the opinion of the witness was incompetent, as the jury was as capable of drawing the conclusion as the witness. The record fails to show any objection at the trial on the ground that the witness was not qualified or competent to answer the questions asked. There was no objection that the witness's testimony [918] was not the ''best evidence.'' The objections made were on the ground that the questions called for opinions and conclusions. However, it appears from the record that both parties had treated the witness as an expert and as well

qualified to give full information about the records and procedure of the Veterans Administration. The witness's statement concerning the meaning of the phrase "physically qualified for honorable discharge" was, in effect, confirmed by appellant's testimony that, if he had complained of his physical troubles, he would not have been discharged. Further, respondent was entitled to show the meaning of the particular phrase used in the report which had been read to the jury. It is apparent that the words were used in a technical sense and that their meaning would not be clear to the ordinary juror. The witness had been treated as an expert and no objection had been made concerning his qualifications or competency to give the technical meaning of the terms used in the records, which were in the witness's possession. On the record presented the court did not err in overruling the several objections. Finnegan v. Missouri Pac. Ry. Co., 261 Mo. 481, 504, 169 S. W. 969; Wear v. Sanger, 91 Mo. 348, 356, 2 S. W. 307; Wentzel v. Lake Lotawanna Development Co., 226 Mo. App. 960, 48 S. W. (2d) 185, 197; State ex rel. State Highway Commission v. Bengal, (Mo. App.), 124 S. W. (2d) 687, 689; 32 C. J. S., Evidence, Sec. 482, p. 138. Considering the record as a whole, as hereinbefore fully set out, no reversible error, prejudice or abuse of the court's discretion is shown. Stephens v. Kansas City Gas Co., 354 Mo. 835, 191 S. W. (2d) 601, 606.

■ . Was the verdict inadequate? In considering this assignment we must keep in mind that the question of the amount of damages is primarily for the jury. In a personal injury case, as here, where appellant seeks such damages as "will fairly compensate him for his injuries, for pain of body and mind, if any, he has suffered by reason of the negligence of the defendants and for such permanent injuries, pain of body and mind, if any, that plaintiff will suffer with reasonable certainty in the future," there is no definite standard by which the damages may be ascertained. The jury's discretion is conclusive on appeal unless the verdict is so grossly inadequate or excessive as to show that the discretion granted has been arbitrarily exercised and abused. Marlow v. Nafziger Baking Co., 333 Mo. 790, 63 S. W. (2d) 115, 121; Mooney v. Terminal R. Ass'n. of St. Louis, 353 Mo. 1080, 186 S. W. (2d) 450, 455. Accordingly, an appellate court should not disturb the finding of the jury on the amount of damages unless it is apparent from the record that the verdict is in fact grossly excessive or grossly inadequate. Plater v. Kansas City, 334 Mo. 842, 68 S. W. (2d) 800, 804; Crockett v. City of Mexico, 336 Mo. 145, 77 S. W. (2d) 464, 469. If the verdict is so shockingly inadequate as to indicate that it resulted from passion and prejudice it should be set aside. Grodsky v. Consolidated Bag Co., 324 Mo. 1067, 26 S. W. (2d) 618, 623; Coghlan v. Trumbo, (Mo. Sup.), 179 S. W. (2d) 705. In determining whether the verdict is grossly inadequate we must consider the evidence favorable to the verdict

returned, because it was the peculiar and sole province of the jury on the trial, and the trial judge on the motion for a new trial, to pass upon the weight of the evidence and the credibility of the witnesses. Holzemer v. Metropolitan St. Ry. Co., 261 Mo. 379, 411, 169 S. W. 102; Coghlan v. Trumbo, supra. In this case the verdict has been approved by the trial court and, if there was substantial evidence to support the amount of the verdict as returned by the jury, it should not be disturbed by this court. Cochran v. Wilson, 287 Mo. 210, 229 S. W. 1050, 1056. With these principles in mind, we will review the evidence on the issue of damages, not only to determine whether the jury's verdict is so shockingly inadequate as to indicate passion and prejudice, but to further determine whether the trial court abused its discretion in not granting appellant a new trial.

Appellant was eighteen years of age when injured. He was received at the hospital at Olathe, Kansas, on November 4, 1943, suffering pain in the "pelvis region and bladder." The report shows, among other things: "Diagnosis: Fracture, simple, pelvis . . . Patient in auto accident [919] last night and passed bloody urine, and later could not pass urine, doctor unable to catheterize. Numerous contusions and abrasions on the body. . . . Cystostomy suprapubic performed 11-5-43 under spinal anasthesia . . . Bladder distended above umbilicus, tissue over bladder when exposed filled with old blood clots."

Appellant testified that a catheter was maintained in place for 15 days and a tube into his bladder for 20 days; that he was in bed over a month; and that he was up, out of bed for about three weeks during his stay in the hospital. The incision had almost healed before he left the hospital, although he still had a bandage on it. He reported back to Camp Pendleton, California, where he remained about three weeks before being shipped overseas to Maui in Hawaii. After a training period of three months, he participated, within the next six months, in the two landings of the Marines at Saipan and Tinian in the Pacific. He then returned to Maui in the Hawaiian Islands, where his outfit for 3½ months prepared for another invasion. He subsequently participated in the landing at Iwo Jima, between February 19 and March 7, 1945, and was wounded and sent by hospital ship to Guam and, subsequently, to the Hawaiian Islands, Ahiew, for treatment for wounds. When the war was over he was sent back to Camp Pendleton, California, and then to Chicago, where he was discharged November 7, 1945.

After his discharge from the hospital at Olathe, Kansas, on December 28, 1943, he spent a total of 21 months in active service as a first class private in the Marine Corps and during this period he received no medical treatment on account of any injury sustained in the collision, other than a few pills. During the time he was in the hospital for treatment on account of combat wounds, which included injuries

to his fingers, right thumb, right arm, left elbow, hip and leg, he received no treatment for any injury received in the collision. Appellant, however, testified that after he left the hospital at Olathe, Kansas, he had trouble urinating and on two occasions suffered slight hemorrhages, a few drops of blood on each occasion; that he still had pains in his leg, bladder and back; that he had difficulty in starting and voiding his urine; and that he can't urinate freely, but only by force or pressure. This condition continued throughout his army service. During his service, he repeatedly complained of his condition, but received no treatment. After his return to the United States, he made no complaints and received no treatment while in the service and prior to discharge. Shortly after discharge from the Marine Corps, he went to work for the Rival Mfg. Co., doing brazing, and worked there until June 1946. He then went to work for Rupert Die-Casting Company. Except for an interruption on account of the appendectomy, he continued to work, until 90 days before the trial, when he took sick leave and hadn't felt like working up to the time of the trial. His left leg and bladder were bothering him more than they had for a long time, so he reported to the Veterans Administration at Kansas City.

While working at Rupert's he made as much as $2.00 per hour and $90.00 per week on piece work. He was married March 23, 1946.

Appellant was examined by Dr. P. H. Owens and was given internal medicine five or six times. At the suggestion of Dr. Owens, he was examined by Dr. Max Goldman. He was examined by Dr. D. M. Nigro before going to work for Rupert's and was "Ok'd" for any kind of work there. Appellant offered Dr. Owens and Dr. Goldman as his witnesses. Dr. Owens' examinations were made November 9, 1946, March 20, 1947, and April 8, 1947, for the purpose of testifying. The X-ray showed "the pelvic bones were all right." He noticed no limp. He found some pus in the urine. That could come from many things, but it indicated inflammation and infection. Appellant looked robust, he wasn't anaemic, his blood pressure was a little high. Appellant had difficulty in starting his urine in witness's presence, such sometimes happens because of timidity. The difficulty in starting, and the presence of a scar, indicated to witness, there might be an obstruction. The condition, in witness's opinion, was caused by an obstruction to the outlet or some weakness of the bladder wall.

[920] Dr. Max Goldman saw appellant about two hours, on April 8th and 12th, 1947, to ascertain whether the canal that leads to the bladder was adequate to serve its purpose. He found that the canal at the neck of the bladder was obstructed so that the only instrument that could enter was "a very tiny fiber about the size of a good sized straw." He testified: "The examination showed that the neck of the bladder, owing to an injury, had, in the healing processes, contracted or scarred to such an extent that the natural outlet for the

urine or water, was obstructed in the passage of the contents of the bladder." This stricture at the bladder neck, could effect health, since appellant could never completely empty the bladder and since there was no proper elimination of urine and poison, the poison would accumulate in the system. The obstructed condition was permanent and would get worse. He gave no treatment, but the authoritative method would be gradual dilation of this canal to relieve the obstruction. A urinalysis showed a trace of albumen, "some bacteria and pus cells and some blood cells in the urine, . . . a definite indication of infection present and persistent." He presumed the bacteria and pus cells could be caused by many things. He personally observed appellant's difficulty in starting and voiding his urine.

Respondent offered the report of Dr. Wm. F. Kuhn II. He examined appellant on November 21, 1946. His report shows that he found "an occasional pus cell" in the urine, but that appellant was "a very husky young man of 21," and had "gained 27 pounds in the last year." His report concluded: "In view of rather negative X-ray findings, except for the metallic densities in the upper left thigh, and the fact that he has a normal urine and has gained weight, appears to be normal and does not walk with a limp, I would consider that this man was in very good health. All one has to go upon are his complaints and there are certainly very few findings. There is the finding of pain in his left lumbar region, but one could easily contribute this to the fact that he has been wounded in his left leg and that he has favored this leg, thereby causing the X-ray evidence of minimal malalignment of the lumbar spine. This is a very common finding in people who have injured their knees, foot or similar lower extremities. This man had no trouble urinating in my presence and as I have stated, his urine is normal. Certainly if he has any residual bladder infection or inflammation, it would show up in the urine at this time. It is of significance that he was able to be shipped overseas for some twenty months and able to make three invasions in the Pacific."

The record further shows no loss of earnings, unless during the 90 days preceding the trial and while appellant was on sick leave. No expense for medical treatment was shown. As indicated in Dr. Kuhn's report, appellant's pain, suffering and difficulties, since his discharge from the hospital at Olathe, Kansas, on December 28, 1943, rest largely upon appellant's own testimony and are in no sense conceded by respondent. Nor is it conceded that appellant now has any abnormal condition resulting from any injury sustained in the collision. The jury had the whole record before them, they could determine the credibility, weight and value of each witness and particularly the weight and value of appellant's own testimony concerning the pain, suffering and difficulties experienced since his discharge from the hospital. The jury could also consider appellant's appear-

ance, his military service, his subsequent employment and his failure to secure treatment or consult physicians until shortly before the trial, as well as other facts, in determining appellant's damages and present physical condition. They did not need to believe that he repeatedly complained while in the service, and yet received no treatment. Considering the evidence in a light most favorable to the verdict, as rendered, giving due recognition to the factors mentioned, supra, the record fails to show that the verdict is grossly inadequate; nor does it indicate that the verdict was the result of passion and prejudice. The jury's verdict in this case, approved as it has been by the trial court, should not be disturbed.

The judgment is affirmed. [921] *Bradley* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.