Saraphin VOGRIN, Appellant,

v.

FORUM CAFETERIAS OF AMERICA,
Inc., Respondent.

No. 46328.

Supreme Court of Missouri,
Division No. 1.

Dec. 9, 1957.

Rehearing Denied Jan. 13, 1958.

Charles M. Miller, Kansas City, for appellant and plaintiff.

Norman S. Howell and John A. Weiss, Howell, Rayburn & Sanders, Kansas City, for respondent.

HYDE, Judge.

Action for $20,000 damages for personal injuries. Plaintiff had verdict and judgment for $1,000. Defendant's motion to set aside verdict and judgment and enter judgment for defendant in accordance with its motion for directed verdict was sustained and judgment was entered for defendant. Plaintiff's motion for new trial, one of the grounds being inadequate damages, was overruled. Plaintiff appealed to the Kansas City Court of Appeals but the case was transferred here (Vogrin v. Forum Cafeterias of America, Mo.App., 301 S.W.2d 406) because plaintiff's claim of inadequacy of the verdict made the amount involved more than $7,500.

Plaintiff was injured by falling on the sidewalk in front of the Forum Cafeteria in Kansas City. The principal issues are whether plaintiff made a case for the jury and, if so, whether the verdict is inadequate.

Plaintiff was an operator for the Southwestern Bell Telephone Company and had been employed there for 30 years. She had worked on Sundays from 7:00 a.m. to 4:00 p.m. for sometime and had been eating breakfast at the Forum (which opened for serving at 6:15 a.m.), before going to work, for about two years. On Sunday, August 16, 1953, plaintiff drove downtown and parked her car on the opposite side of the street from the Forum, about 6:10 a.m. On her way (about 5:30 a.m.) she stopped to go to church and it rained hard while she was in the church. It rained more as she drove to the Forum; she got out of her car (leaving her hat in the car to keep it from getting wet) and crossed the street, reaching the sidewalk south of the Forum. When she reached the Forum sidewalk, she was under an awning and stopped to see how wet she was. She said: "I just looked down and shook my dress to see how wet I was. * * * I went to put my left foot out and I felt it slip and that is the last I remember. Both feet went at the same time." Plaintiff said she was wearing oxfords with rubber heels about 2½ inches high. She said "the slickness and wetness of the pavement" caused her to fall. She said she did not see any hole or any cracked or uneven spots in the sidewalk nor any debris or mud. She also testified: "Q. Mrs. Vogrin, I merely asked you, did you know what caused you to slip? A. No, sir. Other than the sidewalk was wet." After plaintiff fell and while waiting for an ambulance, she saw men go out and put rubber mats down on the sidewalk.

The whole sidewalk in front of the Forum was terrazzo and was built by defendant in 1938. It was in the heart of the business district and was a much travelled sidewalk, both day and night. It had a slope of 11 inches in the 17 feet 6 inches from the entrance door to the south edge of the building, amounting to a slope of 62/100 of an inch per foot. This slope followed the slope of the entire sidewalk from Twelfth Street to Thirteenth Street. Plaintiff's witness, who measured this slope, said: "Terrazzo pavement consists of marble chips or pieces of marble which are set into cement and then ground to polish them. * * * It is a highly polished surface and for that reason being very smooth can be slick." He said that rain water does tend to accentuate the slickness. However, he said he did not know anything about its

abrasive content (alundum); that alundum could be used to produce a non-slick surface; that he never examined the composition of defendant's terrazzo sidewalk, and that he did not know whether it was or was not slick. Defendant's manager, called as a witness by plaintiff, testified that defendant's terrazzo sidewalk had various colors in it and had its name in large letters in terrazzo opposite the entrance; that it was never polished but was cleaned occasionally with a soapless detergent; that it was flushed every night with water and dry-mopped to pick up the water; and that it was swept three times daily. He also said defendant had rubber mats (50 foot lengths) which were originally used for sleet and icy weather but they later got in the practice of using them in rainy weather; that "if it looked like it was raining for any extended period we put down the rubber mats"; and that the mats gave more secure footing and better traction. These mats were kept in the basement of defendant's cafeteria. About three months after plaintiff fell asphalt was laid over the terrazzo, but the manager said this was done because the terrazzo had worn through to the concrete base at the door and it cost less to lay asphalt than to re-terrazzo the whole surface. Plaintiff also had testimony of two witnesses who had slipped on defendant's sidewalk, during the same year, when it was not raining. Defendant's evidence and the medical testimony will be hereinafter stated.

█ The trial court's ruling that plaintiff did not make a jury case was based on our decisions in Schmoll v. National Shirt Shops, 354 Mo. 1164, 193 S.W.2d 605 and Fletcher v. North Mehornay Furniture Co., 359 Mo. 607, 222 S.W.2d 789. Plaintiff, although making the claim that the sidewalk was a nuisance, relies on the following negligence cases involving terrazzo surfaces, namely: Cardall v. Shartenberg's, Inc., 69 R.I. 97, 31 A.2d 12; Erickson v. Walgreen Drug Co., 120 Utah 31, 232 P.2d 210, 31 A.L.R.2d 177; Brody v. Albert Lifson & Sons, 17 N.J. 383, 111 A.2d 504;

Grant Co. v. Karren, 10 Cir., 190 F.2d 710; Barker v. Silverforb, Mo.App., 201 S.W.2d 408. On the claim of nuisance, plaintiff cites Boyle v. Neisner Bros., 230 Mo.App. 90, 87 S.W.2d 227. However, that was a case of a permanent obstruction of a public sidewalk by a heavy door, which swung out over about a third of the sidewalk in a congested area much used by the public, held to be inherently dangerous. We discussed the principles involved in determining the question of nuisance in Pearson v. Kansas City, 331 Mo. 885, 55 S.W.2d 485. (See also Brown v. City of Craig, 350 Mo. 836, 168 S.W.2d 1080; State ex rel. W. E. Callahan Const. Co. v. Hughes, 348 Mo. 1209, 159 S.W.2d 251.) We pointed out that " 'negligence' is the failure to exercise the degree of care required by the circumstances", while "a 'nuisance' does not rest on the degree of care used, but on the degree of danger existing with the best of care"; and that "there must, however, be a degree of danger (likely to result in damage) inherent in the thing itself, beyond that arising from mere failure to exercise ordinary care in its use before the question of a nuisance can properly be submitted to a jury." (55 S.W. loc. cit. 489.) We have also held that "inherently dangerous means that danger inheres in the instrumentality or condition itself, at all times, so as to require special precautions to be taken with regard to it to prevent injury; instead of danger arising from mere casual or collateral negligence of others with respect to it under particular circumstances." (168 S.W.2d loc.cit. 1082.) We held in the Schmoll case (193 S.W.2d loc.cit. 607) that terrazzo was not inherently dangerous and in the Fletcher case (222 S.W.2d loc. cit. 794) approved this holding. We think this must be our ruling under the evidence in this case and our conclusion is that plaintiff's evidence did not make a case of nuisance. Plaintiff's own testimony was that it was the wetness of the sidewalk that caused her to slip and her petition alleged the use of rubber mats on the walk, when it was raining, which had not been put down when she fell. Plaintiff also alleged

mopping with soap and giving the walk a high polish which she did not prove. We, therefore, hold that plaintiff did not prove a nuisance case and that plaintiff's contention that she was entitled to a directed verdict on liability is without merit.

■ Did plaintiff make a negligence case? We think there are some important differences between this case and the Schmoll and Fletcher cases. In the Schmoll case [193 S.W.2d 608], while it was claimed that the entire terrazzo floor of the entrance lobby was slippery when wet, it was the highly polished brass letters embedded in the floor that were dangerously slippery. The principal basis of that decision was that this lettering was obvious, "was seen by plaintiff; and by her seen to be wet"; and that "plaintiff had as much knowledge of the condition of the brass lettering as had defendant." In the Fletcher case, a portion of the sidewalk in front of the defendant's store entrance was terrazzo and at the time the plaintiff fell it had been there 8 years. The amount of travel on it was not shown and there was evidence that 32 percent of nonslip material was used in its construction. The plaintiff fell on a day when it had been snowing and there was evidence of snow, sleet and ice on the ground; and we commented that neither defendant therein "is responsible, under the facts, for any hazard added to the situation by the weather condition", distinguishing a cited Massachusetts case on that basis. We also cited and quoted from that part of the Schmoll case concluding "there is no liability of defendant for injuries from dangers that are as obvious, or as well known to plaintiff as to defendant." Since only the part of the sidewalk in front of the store entrance, in that case, was terrazzo, it was, no doubt, meant that the difference between it and the rest of the walk was open and obvious, but we think that rule was more applicable to the brass letters in the Schmoll case than to the sidewalk in the Fletcher case. However, in the present case the entire sidewalk was terrazzo.

In the present case, the sidewalk had been there 15 years when plaintiff fell. It had been subjected to heavy travel and, since the terrazzo was shown to have been worn through to the concrete base at the Cafeteria entrance, and defendant had estimates made on re-terrazzoing the whole walk, the reasonable inference is that it was worn to some extent in other places. Defendant's witness who had supervised "the lay-out of the design and mixing of the colors and nonslip aggregate" when the walk was laid, said as to the percent of alundum used: "The minimum specification is 20 percent, and it runs from 20 to 25, which one of those, I don't remember, but I know it was that much at least, 20 percent. * * * Normally I would say that is okay." He also said: "Apparently practically all the area seemed to have as much alundum in it as it ever had." In the Rhode Island case, where the plaintiff fell on a wet terrazzo pavement in the vestibule of a store, the court said (31 A.2d, loc. cit. 17): "there was evidence, and reasonable inferences therefrom favorable to the plaintiff, which raised questions for the jury to determine whether there was very little abrasive material at the surface of the vestibule floor on which the plaintiff slipped and fell; whether because of this fact and the double slope in that floor it would, if no extra protection was then provided, be dangerously slippery on business days in wet, snowy, or slushy weather, on account of the water that would be upon it; and also whether the defendant was negligent in not having, at the time of the accident, a rubber mat or other effective protection on this floor at the place where the plaintiff slipped and fell." Thus in that case, the court considered that if defendant knew or by the exercise of ordinary care would have known that the use of this vestibule was extremely dangerous when wet, it would have a duty, whenever such condition existed, to use ordinary care to protect persons lawfully using this vestibule from the danger incidental to such condition by means of temporary floor mats or covers.

The Utah case, where the plaintiff also fell on a wet terrazzo floor of an entranceway to a store, followed the Rhode Island case, ruling (232 P.2d loc. cit. 213) that a proper ground for holding the defendant (a lessee in possession) liable (even though there was no case against the owner on the basis of negligent construction or maintenance) would be "that the appellant being in the actual possession of the premises, either knew or should have known of the slippery condition of the terrazzo when wet, realized that it constituted an unreasonable risk to business visitors, and should have either given them warning thereof or taken steps to obviate the condition." (Defendant had used mats in the entranceway.) Likewise, in the New Jersey case, also a case of the plaintiff falling on a wet terrazzo floor of a vestibule, the court said (111 A.2d loc. cit. 507): "In the present case there was evidence from which a jury could reasonably infer that the construction of the floor rendered it peculiarly liable to become slippery by virtue of introduction of water thereon and that the defendant omitted precautions which would have been practical or reasonable under the circumstances of this case." (Referring to the use of mats.) It is true that in all of these cases there was some evidence of insufficient alundum content in the terrazzo. However, as we have pointed out, defendant's evidence herein showed only that the minimum amount had been used in the walk herein involved. In the 10th Circuit case, where the plaintiff fell on the wet terrazzo entranceway of a store, it was shown (190 F.2d loc. cit. 711) that it was defendant's custom to sprinkle nonskid powder on the entranceway whenever there was a storm; and the court said: "Here the appellee's own testimony establishes that it knew of the slippery condition of such floors when wet and that it instructed its porter to put additional Non-skid material on the entrance way under such conditions. Under the decision of the Supreme Court of Utah, we think it became a question of fact for the jury's determination whether under the existing conditions appellant exercised reasonable care for the safety of its invitees."

■ We think these cases are applicable to the facts in this case and that the evidence is sufficient to show defendant knew the sidewalk had become very slick when wet and had for some considerable period of time followed the practice of putting down the rubber mats, kept on hand for this purpose, whenever it was raining. Since the entire sidewalk was terrazzo, plaintiff could not avoid walking on it as the plaintiff in the Fletcher case could have avoided the terrazzo part of the walk, in front of the store entrance, in that case. Under the facts of this case, therefore, we conclude the jury could reasonably find defendant had a duty in rainy weather to protect persons lawfully using the walk by putting down the rubber mats it had for this purpose, and was negligent in not having done so at the time of plaintiff's fall. Defendant suggests that only the City would be liable for plaintiff's fall on the sidewalk, citing Callaway v. Newman Mercantile Co., 321 Mo. 766, 12 S.W.2d 491, 62 A.L.R. 1056 and Watts v. R. A. Long Bldg. Corp., Mo.App., 142 S.W.2d 98; but see cases cited in the Fletcher case, 222 S.W.2d loc. cit. 794. However, defendant took this issue out of the case by its admission in affirmatively agreeing to the following question by the court: "As I understand, you make no contention you are not legally responsible to the same degree that the city or any other person similarly situated would be?" We, therefore hold that plaintiff made a case for the jury.

■ Since we hold plaintiff made a jury case, and because of the view we take of plaintiff's claim of inadequacy of the verdict, it is not necessary to pass on plaintiff's claim of admissibility of certain exhibits offered by her and excluded by the court. This also seems true of plaintiff's claim of error in the ruling on defendant's motion to set aside the verdict by the court before the time for filing a motion for new trial by plaintiff had expired. We note,

however, that plaintiff's counsel was present and cited authority to the court on his claim that plaintiff made a jury case and made no objection to the court taking up defendant's motion at that time. Thus, in any event, we hold this would be a waiver and so nothing was preserved for review of the alleged premature action of the court.

■■ As to inadequacy of damages, the rule is that the jury's discretion is conclusive on appeal unless the verdict is so grossly or shockingly inadequate as to indicate that their discretion has been arbitrarily exercised and abused or is the result of passion and prejudice. Wilhelm v. Kansas City Public Service Co., 358 Mo. 6, 212 S.W.2d 915; Conner v. Neiswender, 360 Mo. 1074, 232 S.W.2d 469; Roush v. Alkire Truck Lines, Mo.Sup., 245 S.W.2d 8. Plaintiff had an X shaped cut on the back of her head which required 16 stitches and her doctor thought she had a concussion. He said there was a lot of blood under the skin in her lower back "over the sacral area" (a black and blue area, "big as you hand or more") which "indicated she had received a pretty good blow there." However, X-rays showed no bone damage. He said plaintiff had pain in her back for which he had treated her at least 15 times in 2½ years and that she wore a girdle for back support. He also treated her for menopausal condition. She also received treatment from a chiropractor.

Plaintiff had sustained three previous injuries. In June 1952, she was injured when an automobile in which she was riding, missed a curve, went down an embankment and struck a utility pole. Plaintiff said she sustained a hair line fracture of the third lumbar vertebra, bruised left leg, three fingers out of place and facial and eye injuries. She had a back injury but said it was a different part of the back from that injured in her fall on the sidewalk. Plaintiff brought suit in the Federal District Court for these injuries and that suit was tried after she sustained the inju-

ries sued for in this case. In that case she testified: "I was black and blue across the lower part of the seat where I had struck back up against the rod on the edge of the seat * * * my back hurt so bad and my neck was stiff. * * * My back between my shoulders felt like somebody had put their hand on the inside and picked something out." In September 1952, she stepped in a hole in a sidewalk, injuring her left foot, for which she made a claim against Kansas City. Previous to these injuries she had been struck by a taxicab, knocked down and had a torn ligament in her leg for which she had received a settlement. Plaintiff went back to work November 11, 1953. Her total hospital and medical bills were $594.56 and she claimed a wage loss of $366 which was based on possible extra work and overtime, the Telephone Company having paid her regular flat pay for five days per week.

Defendant's doctor stated the result of his examination of plaintiff, as follows: "She had multiple subjective complaints referable to this injury consisting of pain and discomfort in the lower back with radiating pains into the left lower leg and foot; a pounding sensation in her heart; going to sleep of both arms; discomfort in the left jaw; pain in the left side of the neck; an uncontrollable nervous system; and difficulty in going through her menopause. Patient may have the above subjective complaints as enumerated, however, I am unable to account for these complaints from an objective and clinical examination. The X-rays are essentially normal as far as any injury or organic disturbance is concerned. This patient does have a positive clinical finding of an injury in that she has a well healed, thickened, tender scar in the top part of the scalp which she states is a result of the injury. She gives a history of being unconscious for several minutes following the injury. The clinical, neurological, and X-ray findings at this time referable to the head injury are essentially normal, and with the period of time that has elapsed and no posi-

tive clinical manifestations have become apparent, it is my opinion she will·eventually make an uneventful recovery from her head complaints. I feel there is a strong psychogenic overlay present in this case and also patient is apparently having some rather sever menopausal symptoms which apparently are serving to aggravate and prolong her complaints referable to the injury. It is my opinion that the psychogenic overlay and menopausal condition are not the result of the alleged injury." This doctor had previously examined plaintiff prior to the trial of her case in the Federal Court and said that, at that time, "she complained of pain upon deep pressure over the entire upper and mid-portion of the back. All motions of the back were slightly limited and she complained of some pain and discomfort. Percussion of the head and vertebral column produced slight pain in the mid-dorsal region of the back. There was no pain upon pressure over either kidney area. * * * It was my opinion from examining this patient on this date that she had multiple subjective complaints referable to her head, neck, both upper extremities, face, back, left leg, and left breast."

 As shown by the above cited authorities (in each of which the plaintiff got less than $1,000 damages), we must "consider the evidence from the standpoint favorable to the verdict and to the action of the trial court in overruling plaintiff's motion for new trial on the ground of inadequacy." (See Roush case, 245 S.W.2d loc. cit. 10.) The weight and credibility of plaintiff's evidence was for the jury to determine; and it could reasonably have found that the only substantial injury plaintiff received was her head injury; that her head injury had completely healed; that any back injury or discomfort mainly was due to other accidents or causes; and that even part of the medical expenses she had incurred for treatment for her back was not for injuries caused by her fall on defendant's sidewalk. Furthermore, her claim of loss of wages was rather speculative and the jury was not required to ac-

cept her testimony about it. The trial judge, having the function of weighing the evidence, has made no finding of inadequacy herein; so considering all these factors, we must hold that the record does not show passion and prejudice of the jury, or arbitrary action or abuse of discretion on the part of the jury or the trial court and, therefore, fails to show that the verdict is inadequate.

The judgment is reversed and the cause remanded with directions to reinstate the verdict and enter judgment thereon for plaintiff for $1,000.

All concur.