Leona PINKSTON, Appellant,

v.

Patrick McCLANAHAN and Robert McClanahan, Respondents.

No. 48117.

Supreme Court of Missouri, Division No. 2.

Nov. 13, 1961.

Thomas A. Mathews, Farmington, Roberts & Roberts, by J. Richard Roberts, Farmington, for appellant.

Dearing, Richeson & Weier, H. L. C. Weier, Hillsboro, for defendants-respondents Patrick McClanahan and Robert McClanahan.

LEEDY, Judge.

Action by Leona Pinkston to recover $25,000 damages for personal injuries sustained by her when struck by an automobile owned by defendant Robert McClanahan and driven by his 17-year-old son Patrick, the other defendant. The jury returned a verdict (signed by ten members) finding the issues in favor of plaintiff and

against both defendants, and assessing plaintiff's damages in the sum of $2,000. Neither defendant sought a new trial, but both joined in filing a timely motion to have the verdict (and the judgment entered thereon) set aside, and to have judgment entered in accordance with their motion for a directed verdict, as offered at the close of all the evidence. Plaintiff filed a motion for new trial (but asking that the same be restricted to the issue of damages alone) alleging as the single ground therefor, the following: "Under the law and the evidence said verdict is inadequate." Both motions were overruled, and plaintiff alone has appealed.

■ This court has jurisdiction of the appeal because in this instance the "amount in dispute, exclusive of costs" is represented by the difference between the amount sued for and the sum awarded, and hence exceeds $15,000. Art. V, § 3, Const. of Mo., V.A.M.S., and § 477.040, RSMo 1959, V.A. M.S.; Hemminghaus v. Ferguson, 358 Mo. 476, 481, 215 S.W.2d 481, 482; Conner v. Neiswender, 360 Mo. 1074, 1076, 232 S.W. 2d 469, 470; Combs v. Combs, (Mo.) 284 S.W.2d 423, 424

The single issue presented on this appeal is that of the inadequacy of the amount of the verdict, as raised in plaintiff's motion for a new trial. The facts going to the question of liability are therefore not material, and will not be stated further than to say that the casualty out of which this action arose was "an automobile-pedestrian collision" occurring on Division Street in Bonne Terre during the noon hour on May 15, 1958. The defendant-driver was called as a witness for plaintiff, and he testified directly to the fact that the car he was driving struck plaintiff as she was walking in the street carrying a sack of groceries.

As a result of the collision, plaintiff was knocked down and severely injured. She was taken by ambulance to the Bonne Terre Hospital where she was attended by her physician, Homer Appleberry, M.D., and X-rays were taken. Later that day she was removed to Barnes Hospital in St. Louis where she remained about two weeks, or until May 31, on which day she was taken by ambulance to the Thomas Dell Nursing Home at Farmington. She was confined in the latter institution as a patient until discharged on or about Jan. 3, 1959.

Dr. Appleberry testified as to plaintiff's condition and the nature of her injuries when he saw her at the Bonne Terre Hospital on the day she was injured, as follows: That "she had a lot of pain"; that she had multiple bruises and cuts on her face; that she had multiple fractures—one of her left leg, and she had a fractured pelvis, and a fractured right leg and knee. On arrival at Barnes Hospital about 8 p. m., plaintiff was attended by Dr. Herbert Spady, an orthopedist, who testified in her behalf by deposition. His examination disclosed the following: She was an elderly, white woman, markedly obese, and was suffering from an acute injury. She had a laceration over the right eye with some crepitus over the nose—"crepitus" meaning, "Oh, kind of a crunchy feeling like you might feel if you squeezed a bag of popcorn." There was pain to pressure over the area of the right pubic bone; there was pain on motion of the right knee, and there was swelling and blueness or bruised look around the right knee. There was also a bruise of the left knee, and there was a false motion, that is, motion in the mid-portion of the thigh and pain in the left thigh, whereas there shouldn't have been any motion in any of the mid-portion of the thigh. Following the examination, she was put in traction to relieve her pain and to keep the bones in line so they wouldn't damage tissue pending surgery, which was performed the next afternoon. This witness identified numerous X-ray photographs of plaintiff, among which was one showing a spiral fracture of the mid-portion of the shaft of the left femur; he assisted in performing an operation for that fracture, which he described as follows: "Well, the patient was, of course,

put to sleep and an incision was made over the outer part of the left thigh and carried down to the bone at the fracture site. Then a reamer was passed towards, up through the bone towards the patient's head until it passed out of the skin in the area of the hip. The reamer was then passed through the bone towards the patient's feet until it was thought that the canal was reamed enough for the passage of a nail. Then a one-half inch in diameter nail was driven up the shaft of the bone out through the skin and then driven back down through the, the fragment towards the feet. The wound was then closed in the usual manner and the skin was closed in the usual manner."

Dr. Spady further testified that unless there is another operation the nail will remain in place the rest of the patient's life. Interpreting other X-rays taken following the surgery just mentioned, the witness stated one of the photographs showed "the femoral nail in place in the canal of the femur bridging the fracture site and holding it in good position and alignment"; that another showed "the fracture site with the nail bridging across it with formation of callus at the fracture site." Not having examined plaintiff since, the witness was unable to give an opinion as to whether the fact that the nail is through the upper part of the femur would affect the use of the joint where the femur joins onto the body. He further stated that a nail in the position of this particular nail (the upper end sticking out of the bone into the adjacent soft tissue) may cause pain, but it does not necessarily do so.

He also said the X-rays revealed and that he found fractures of both the tibia and the fibula of the right leg, that of the tibia being just below the knee and extending into the knee joint and associated fracture about four inches down on the fibula. (This was placed in a cast extending from the groin to the toes.) The same X-rays showed considerable joint disease which, in the opinion of the witness, ante-

dated the trauma. X-rays of the right knee taken Nov. 14, 1958, showed no change in the degenerate condition previously found in the knee joint, but did show "considerable healing of the fractures of the knee with considerable new bone formation around the fractures." The witness could not tell whether there was any stiffness in that knee joint. In addition, plaintiff had a fracture of the right pubis and a fracture of the right ischium, the pubis and ischium being portions of the pelvic bone. X-rays taken Aug. 29, 1958, showed these fractures healed. From his examination, this witness was of the opinion that plaintiff had a fractured nose (but for which no treatment was given). His other findings were that she had a small laceration of the face and multiple bruises, one in the area of the left knee, and another on the right knee in the area of the fracture. The patient was conscious on arrival at the hospital, but in pain. During the first three or four days the patient complained of pain and nausea and she vomited a good deal. She had pains in her chest, and the witness suspected she might have a fractured rib, but no X-rays were taken of the chest.

Cross-examination developed that witness did not find any injury to plaintiff's spine, but that X-rays taken on the day she entered the hospital showed extensive osteoarthritic changes in the lumbar spine, which condition had existed for years, and that it was the feeling of the witness that it would be expected that this condition would cause more pain in a large, obese woman such as plaintiff than in a thinner patient, although he could not say from his experience that such was true. The X-rays also showed pre-existing osteoarthritic changes in both the hip and knee joints. The treatment plaintiff received was the usual and customary kind for the type of fractures involved; in fact, the technique of nailing of the femur was stated to be one of the newest and most modern methods used in the reduction of a fracture of the femur, and holding the fractured bone in place. Plaintiff's frac-

tures healed and callus developed around them.

Dr. Appleberry did not see plaintiff from May 15, 1958, (the date of the accident) until the 31st of that month, and he saw her at that time at the Thomas Dell Nursing Home in Farmington. She was in bed and "had a cast on her legs from above her waist down to and including her feet." He continued to treat and prescribe for her until the time of trial; this included pain medicine and medicine for her high blood pressure (a pre-existing condition for which he had treated her since 1950); the latter condition had remained "about the same" practically up to the date of trial. Flexion (that is, her ability to bend the knee back) is about 30 degrees in the right knee, and about 40 in the left, the right knee being the worst one. That condition is permanent. The patient was in pain when he saw her at the Bonne Terre Hospital, as well as subsequently at the nursing home, but less so at the latter. She required pain medicine at intervals. The last time he saw her at the nursing home was Sept. 8, 1958, and she still had the cast on at that time. He did not know when the cast was removed. He saw her in her home on Feb. 17, 1959, and again on Apr. 14, 1959. On these occasions she was on crutches. The last time he saw her before the trial was Oct. 24, 1959, when she came to his office—"she walked in then," using a cane. The witness described plaintiff's movements as hobbling around—"she doesn't get around very good." She was still receiving medication for pain at the time of trial, and in the opinion of the witness her pain will continue. Plaintiff had complained of pain in her knees, legs, and back before the accident, but she has complained more since. It was his further opinion that the injuries he found and described were permanent. On cross-examination, he stated that considering plaintiff's age and weight, she had "done very well" in the matter of recovering from the accident. From the complaints she made, he had assumed she had had arthritis before the accident, although no X-rays were taken; those that were taken subsequent to the date of the accident did show arthritis "of the joints." She had been coming to him in regard to the pain in her back and knees since 1950—a condition thought at that time to be a "type of arterial sclerotic heart disease." At various intervals she complained of pain in her arms, legs, and back along with the chest pain.

Dr. Hugh Hartung, a radiologist associated with the hospital at Bonne Terre (and others), and a specialist in the interpretation of X-ray films, also testified on the part of plaintiff. Without developing the details of his testimony, it may be said that he interpreted numerous X-rays taken of plaintiff's affected parts, and his testimony coincided with that of the other medical witnesses as to the numerous fractures suffered by plaintiff. In addition, he also pointed out that at the markedly comminuted or fragmented fracture of the proximal end of the tibia "there is some depression of the lateral portion of the articulating surface, the part that goes to make up the [knee] joint is depressed [and] generally speaking, this attributes to a painful joint because the joint is abnormal." (Resulting stiffness, or not, depending more on soft tissue injury than on bone injury.) He stated that X-rays made Nov. 6, 1959, showed "a marked hyperthropic arthritic change involving the edges of the femur and the edges of the tibia * * * also a marked deformity of the tibia * * that this lateral outside portion of the tibia has been depressed." This is a permanent situation but the fractures are well healed.

In the interest of brevity, and because not vitally affecting the question to be decided, though having some relevance, we omit delineation of other medical testimony in relation to the spurring of certain bony structures of plaintiff's body and the effect of trauma as aggravating pre-existing arthritic conditions as distinguished from predisposition to more serious injury because of such pre-existing conditions.

Plaintiff, a widow, was 64 years of age at the time of trial. She testified as to her

then condition about as follows: That her right leg is stiff, and she cannot move her right knee as well as she could before the accident; that she has trouble in her knees and back, and the lower part of her back hurts "a lot"; that she has some swelling in her ankles and legs, but did not before the accident, except when she was on her feet; they swelled a little, but nothing like following the accident when it has been "just all the time"; that she has trouble in getting around, and walks with a cane, although she can walk some without it, but cannot go up and down stairs without it; prior to the injury she walked without a cane—never used one—and walked wherever she wanted to go—up to the store and places of that kind, but cannot do so now, and hasn't been to the store since the accident; she manages to do a little housework, but cannot get up and down and scrub floors (her daughter does that for her); a neighbor gets the groceries for her; sometimes she has headaches, a lot more than before the accident; she cannot sit down on anything low and get up.

Plaintiff was confined to bed from May 15, 1958 to Nov. 1 of the same year; thereafter she was in a walker for at least two months, and used crutches until at least Apr. 14, 1959. Her bill at Barnes Hospital was $614.45 (admittedly reasonable); the charge of one doctor was $84; the nursing home bill amounted to $1,012.75 and, according to the owner, this was a reasonable charge. These aggregate $1,711.20. There was no showing of any lost wages.

■ The determination of the amount of damages in a personal injury case is, of course, primarily for the jury. Donahoo v. Illinois Terminal R. R. Co., (Mo.) 300 S. W.2d 461, 469; Wilhelm v. Kansas City Public Service Co., 358 Mo. 6, 212 S.W.2d 915, 918. But we are committed to the proposition that where the jury has by its verdict found liability, it is bound to award plaintiff damages commensurate with the nature and extent of the injuries suffered. Coghlan v. Trumbo, (Mo.) 179 S.W.2d 705,

706. In that connection, that case declares that "the test is and the fact of inadequacy is made to appear when the verdict is so meager as to be shocking and can be accounted for or justified only on the hypothesis that it resulted from passion and prejudice on the part of the jury." But many cases recognize hypotheses other than passion and prejudice alone as accounting for, and as a ground of relief against either excessively large or shockingly inadequate awards. Cochran v. Wilson, 287 Mo. 210, 229 S.W. 1050, 1056, enumerates "passion, prejudice *or misconduct of the jury.*" Vogrin v. Forum Cafeterias of America Inc., (Mo.) 308 S.W.2d 617, 622, says this: "As to inadequacy of damages, the rule is that the jury's discretion is conclusive on appeal unless the verdict is so grossly or shockingly inadequate as to indicate that their discretion has been *arbitrarily exercised and abused* or is the result of passion and prejudice." (Emphasis supplied.) See, also, Wilhelm v. Kansas City Public Service Co., 358 Mo. 6, 212 S.W.2d 915; Marlow v. Nafziger Baking Co., 333 Mo. 790, 63 S.W. 2d 115.

■ In passing on plaintiff's motion for a new trial, the trial court weighed the evidence, and by approving the amount of the award found it not against the weight of the evidence. Unlike the trial court, this court on plaintiff's appeal from the order overruling her motion for new trial based on inadequacy, does not weigh the evidence, but determines only whether the trial court abused its discretion in ruling as it did. Rousch v. Alkire Truck Lines, (Mo.) 245 S.W.2d 8, 10. To the end just mentioned, inquiry is limited to whether there is substantial evidence to support the jury's verdict. Glore v. Bone, (Mo.) 324 S.W.2d 633; Spica v. McDonald, (Mo.) 334 S.W.2d 365. And by the phrase "substantial evidence to support the verdict," as here used, is meant and it includes whether the amount of the verdict is responsive to the evidence on the issue of damages, for it has been said, "[T]here can in reason be no difference between a verdict which is not supported

by the evidence as to the amount thereof, and one which is not supported by the evidence at all." State ex rel. Atchison, T. & S. F. Ry. Co. v. Ellison, 268 Mo. 225, 186 S.W. 1075, 1077.

 It is the further rule that in instances where the trial court has approved the amount of a verdict by overruling plaintiff's motion for new trial based on inadequacy, the appellate court will consider the evidence favorable to the verdict returned, this for the reason that the credibility, weight and value of the testimony is for the jury. We have detailed the uncontradicted evidence concerning plaintiff's injuries, which were obviously severe and permanent. Such evidence, of course, was not conclusive as a matter of law, but it appears to be fair on its face. The injuries included six separate fractures: The femur of the left leg, the tibia and the fibula of the right leg, two separate ones of the pelvic bone, and a broken nose, to say nothing of bruises and lacerations. The effect of the verdict is to allow plaintiff's medical and doctor bills and expenses ($1,711.20) in full, plus $288.80 as compensation for her pain and suffering, past and future, and for the numerous permanent and serious physical injuries inflicted upon her person and the resulting damages.

We find a striking analogy between the case at bar and Grodsky v. Consolidated Bag Co., 324 Mo. 1067, 26 S.W.2d 618 (decided 1930), where an award of $1,000 chiefly for multiple fractures of the pelvis, was held so inadequate as to require a new trial. The difference in the value of a dollar at that time as compared with the present creates substantially parallel situations. Upon a consideration of the whole record, we are constrained to hold that the amount of the verdict is so shockingly inadequate as to require a new trial. While plaintiff has asked that the new trial be ordered on the issue of damages alone, we deny that request and, in our discretion, order a new trial of the whole case, this because there was such a sharp conflict in the evidence on

the liability issue that the defendants are as much entitled to have that question redetermined as is plaintiff on the issue of damages. We think both should be reconsidered together. The judgment is, therefore, reversed and the cause remanded for new trial

All concur.