John E. MULLIKIN, Plaintiff-Appellant,

v.

Carl E. NIMMO and Masters-Jackson Paving Company, Defendants-Respondents.

No. 9016.

Springfield Court of Appeals, Missouri.

March 9, 1971.

John R. Lewis, Kirby & Lewis, Springfield, for plaintiff-appellant.

Glenn A. Burkart, Mann, Walter, Burkart, & Weathers, Springfield, for defendants-respondents.

HOGAN, Judge.

This is an action for damages for personal injuries and property damage arising out of a collision of two motor vehicles. Joining Carl E. Nimmo and his employer, Masters-Jackson Paving Company, as defendants, plaintiff prayed the sum of $25,000 as damages for personal injuries and $1,800 as property damage. A jury awarded plaintiff the sum of $500 as damages for personal injuries, and $1,450 as property damage. Plaintiff filed a motion for new trial on the single ground that the award of damages for personal injuries was inadequate. The motion was denied and plaintiff has appealed.

The collision occurred about 10:15 A.M. on August 24, 1967, on Kearney Street in Springfield, Missouri, near the intersection of Kearney and Highway 13. Kearney runs east and west, and at the place involved it is a four-lane street. The plaintiff was driving his automobile west on Kearney. He had stopped his car in the inside westbound lane, and was preparing to make a left turn when he was struck from the rear by a pickup truck being driven by defendant Nimmo.

Mr. Mullikin testified that at the time of the impact, "both knees hit the dashboard of the car," causing a sharp pain in both kneecaps. He went to his office and waited until a police officer arrived. After the officer left, plaintiff asked a friend to take him to a hospital in Springfield, where he "asked them to admit me for a complete examination." The hospital refused to admit him without an order from a physician, so Mr. Mullikin called his wife and she "picked [him] up and took [him] home."

The plaintiff's wife called her mother's physician and asked him to see plaintiff immediately. This physician was unable to do so, but he referred plaintiff to a Dr. Shackter. Plaintiff had pain in "the shoulder portion of [his] body, and [his] left arm." Dr. Shackter examined plaintiff and took X-rays. He prescribed a collar, and "offered" to give plaintiff a shot in his shoulder. Plaintiff asked if the shot would "make it get well any quicker," the doctor said no, and plaintiff "told him to forget it." Plaintiff saw Dr. Shackter several times, but Shackter's treatment did not alleviate his symptoms.

"Several months after," in May 1968, plaintiff consulted another physician, a Dr. Harmon. The plaintiff still had "swelling at the neck, shoulder," and Dr. Harmon "gave [him] some medicine," but "it didn't seem to have any great effect." Dr. Harmon also prescribed "traction treatment" which plaintiff took as an outpatient. Mr. Mullikin had eight of these treatments, but he did not find them particularly helpful. At trial time, plaintiff was still suffering from "[s]tiffness, soreness of the neck, the leaders running back down the shoulder, like a heavy weight or depression, aggravation of the arm, sensation—tingling sensation, and the pain in the joint of the shoulder." There was evidence that Mr. Mullikin drove a great deal in the course of his work before he was injured, and he testified that "[n]othing hurts me any worse today than taking a long drive." He had not been able to resume his former schedule, but no specific loss of earnings was shown. It was brought out on cross-examination that after the accident plaintiff had no external cuts, although he testified he "spit blood two months in a row." The total of plaintiff's medical expense, including hospital charges, was $181.20.

Dr. Harmon, an orthopedic surgeon, testified for the plaintiff. He had first seen Mr. Mullikin in May 1968, at which time plaintiff complained of recurrent neck pain, pain in the left arm, and intermittent pain in his left hand. Dr. Harmon examined the range of movement in plaintiff's neck, the strength in his left arm, and tested plaintiff's reflexes. He also took X-rays of plaintiff's neck. He found no signs of nerve root injury, but the X-ray showed a moderate amount of degeneration of the joints in the plaintiff's neck, especially between the fourth and fifth cervical vertebrae. In view of the pain plaintiff was having, Dr. Harmon referred him to a Dr. Tsang, a neurosurgeon, with the thought that there might be some "abnormality of one of the discs in [plaintiff's] neck." Dr. Tsang found no objective evidence of nerve root injury, and referred plaintiff back to Dr. Harmon.

The X-rays Dr. Harmon took on his initial examination were received in evidence and exhibited to the jury. There were three films, an anteroposterior, a lateral, and a flexion view of the neck. Dr. Harmon explained the X-rays to the jury. The substance of his testimony was that the bony structures, i. e., the vertebrae, were well aligned, without evidence of fracture or partial dislocation. The films ruled out soft tissue tears which would produce instability of the neck. There was some narrowing of the little joints between each of the vertebrae, which, the doctor said, "is in accordance with [plaintiff's] age." There was a small amount of ectopic bone between the fourth and fifth cervical vertebrae. On the basis of his examination and X-rays, Dr. Harmon diagnosed plaintiff's condition as: (a) a "degenerative arthritic situation in his neck," and (b) a discogenic syndrome, which means "pain like a disc rupture * * * without any of the physical signs that there is actually a disc rupture."

Dr. Harmon further testified that he considered plaintiff to be a man of normal emotional stability who had sustained a strain to the ligamentous and soft tissue structures of his neck. At the time of his last examination, the doctor found plaintiff having recurrent episodes of neck pain, pain in his left arm and left hand. Dr. Harmon did not believe that plaintiff was feigning his symptoms, and thought that he would have "recurrent symptoms of the injuries he described to me." The doctor had "no way of knowing for sure" how long plaintiff's condition would continue, but "it [might] well be for an indefinite period of time."

As stated, the sole point advanced on this appeal is that the award of damages for personal injuries is inadequate. In support of this contention, counsel for plaintiff has cited a number of cases, including Joly v. Wippler, Mo., 449 S.W.2d

565, and Pinkston v. McClanahan, Mo., 350 S.W.2d 724, which hold directly or by inference that it is the duty of the jury to award damages commensurate with the injuries suffered. The defendants, maintaining that the point is not properly before us, argue vigorously that since the verdict has the approval of the trial court (as it does), and since it is not so grossly inadequate as to indicate passion and prejudice on the part of the jury, it must be taken as conclusive on this appeal.

We have considered the various authorities cited by the parties, but it is unnecessary to discuss them all in detail. The injuries complained of by the plaintiff in this case were not obvious and easily demonstrable, as were the plaintiff's pelvic and long bone fractures in Pinkston v. McClanahan, supra, 350 S.W.2d 724, or the plaintiff's hernia in English v. Thrower, Mo.App., 146 S.W.2d 667, or the plaintiff's skull fracture in Strange v. Ardison, Mo. App., 65 S.W.2d 115. Further, while Mr. Mullikin did testify that he had "never yet been able to accomplish my normal duties * * * I was doing prior to the accident," there was no specific proof of loss of earnings, and certainly the plaintiff's injuries were not comparable in their effect to the brain damage sustained by plaintiff Paul Joly in Joly v. Wippler, supra, 449 S. W.2d at 570–571 [6]. Unlike Underwood v. Brockmeyer, Mo., 318 S.W.2d 192, which plaintiff also cites, there was no demonstrated irritation of the cervical nerve roots or objective evidence of an extruded intervertebral disc. In this case, the plaintiff's injuries were subjective; his own physician described his condition as a syndrome (group of symptoms) resembling a disc rupture without any physical sign of a rupture. Dr. Harmon also testifed that he found "a degenerative arthritic situation in [plaintiff's] neck," but he described this condition as a "wear and tear" alteration, and a jury could have found, as in Homeyer v. Wyandotte Chemical Corporation, Mo., 421 S.W.2d 306, and Boehmer v. Boggiano, Mo., 412 S.W.2d 103, that plaintiff's complaints were the result of age rather than trauma. Dr. Harmon further testified that he found no evidence of fracture, dislocation, nerve root irritation or soft tissue tears. The possibility of traumatic neurosis was ruled out by plaintiff's own evidence, which was that he was a man of normal emotional stability.

As stated in Homeyer v. Wyandotte Chemical Corporation, supra, 421 S.W.2d at 309–310 [6–8], the burden was on the plaintiff to prove the fact and extent of his injury, and the credibility of his evidence was a matter primarily for the jury. Upon this record, we cannot hold that the damages awarded for personal injury are grossly inadequate or that the trial court abused its discretion in denying plaintiff's motion for new trial.

The judgment is affirmed.

TITUS, P. J., and STONE, J., concur.